### RADIO CORP. OF AMERICA et al. v. UNITED STATES et al.

#### Civ. A. No. 50–C–1459.

United States District Court
N. D. Illinois, E. D.

Dec. 20, 1950.

Kirland, Fleming, Green, Martin & Ellis, Weymouth Kirkland, Chicago, Ill. (Cahill, Gordon, Zachry & Reindel, John T. Cahill, New York City, Howard Ellis, Chicago, Ill., Joseph V. Heffernan, John W. Nields, New York City, of counsel), for Radio Corp. of America.

John F. Baecher, Sp. Asst. to Atty. Gen., Wm. Amory Underhill, Acting Asst. Atty. Gen., James E. Kilday, Sp. Asst. to Atty. Gen., Otto Kerner, Jr., U. S. Atty. for Northern Dist. of Illinois, Chicago, Ill., for the United States.

Benedict P. Cottone, Gen. Counsel, Max Goldman—Asst. Gen. Counsel, Washington, D.C., Richard A. Solomon, Washington, D.C., Erich Saxl, Washington, D. C., Stanley S. Neustadt, New York City, Robert D. Greenburg, Washington, D. C., Daniel R. Ohlbaum, New York City, for Federal Communications Commission.

Arvey, Hodes & Mantynband, Chicago, Ill. (Rosenman, Goldmark, Colin & Kaye, Samuel I. Rosenman, Ralph F. Colin, Richard S. Salant, Robert E. Herman, New York City, of counsel), for Columbia Broadcasting System.

Schapiro & Schiff, Chicago, Ill. (Munchin & Smith, Harry K. Smith, New York City, of counsel), for Pilot Radio Corp.

Righeimer & Righeimer, Chicago, Ill., for Wells-Gardner & Co.

Schradzke & Gould, Chicago, Ill., for Television Installation Service Assn.

Jacobs & Kamin, Alfred Kamin, Chicago, Ill., for Local 1031, International Brotherhood of Electrical Workers, AFL.

Carl Pomerance, Chicago, Ill., for Sightmaster Corp.

Kelly, Kelly & Kelly, Chicago, Ill., for Radio Craftsmen, Inc.

Nash, Ahern & McNally, Chicago, Ill. (Paul, Weiss, Rifkind, Wharton & Garrison, Simon H. Rifkind, New York City, of counsel), for Emerson Radio & Phonograph Corp.

Before MAJOR, Circuit Judge, and SULLIVAN and LA BUY, District Judges.

MAJOR, Circuit Judge.

This action was brought to enjoin and set aside an order of the Federal Communications Commission, adopted October 10, 1950, effective November 20, 1950, which promulgated standards for the transmission of color television. Plaintiff Radio Corporation of America (RCA) is engaged, among other things, in research and development work in the field of electronics, and particularly in the field of radio and television, as well as in the manufacture and sale of radio and television transmitting and receiving apparatus and parts. Plaintiff National Broadcasting Company (NBC) is engaged in sound and television broadcasting, including network broadcasting. Plaintiff Victor Distributing Corporation is engaged in the sale of articles and products manufactured by the Victor Division of RCA. Both this distributing company and NBC are wholly owned subsidiaries of RCA. The defendants are the United States and the Federal Communications Commission.

The complaint sought an interlocutory injunction until the further order of the court and a permanent injunction upon final hearing. The defendants moved for a summary judgment and a dismissal of the complaint on the ground that there was no genuine issue as to any material fact and that defendants were entitled to a judgment as a matter of law.

A three-judge court was convened, as required by Title 28 U.S.C.A. §§ 2284 and 2325. On the issues thus presented, the matter came on for hearing and oral argument was heard on November 14, 15 and 16, 1950.

Prior to the time of oral argument, the Columbia Broadcasting System (CBS), also engaged in sound and television broadcasting, by agreement of the parties, was allowed to intervene in support of the Commission's order. Either during or previous to the oral argument, the following parties, over the objection of defendants, were permitted to intervene in support of plaintiffs'

attack upon the Commission's order: Local No. 1031 of the International Brotherhood of Electrical Workers, representing 21,000 members, 18,000 of whom are employed in Chicago or vicinity in the manufacture of radio and television sets or in the manufacture of parts and in the assembling thereof; Pilot Radio Corporation; Emerson Radio and Phonograph Corporation; Wells-Gardner & Company, Sightmaster Corporation and Radio Craftsmen, Inc., all manufacturers of television receiving equipment; and Television Installation Service Association, a trade organization engaged in the business of servicing and installing radios and television equipment in the Chicago area.

The statutes involved with respect to the jurisdiction of this court are Title 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325 and Sec. 402(a) of the Communications Act of 1934, as amended, Title 47 U.S.C.A. § 402 (a). With respect to the legal authority of the Commission to adopt standards, the provisions of the Communications Act mainly involved are Secs. 4(i), 301, 303(b, c, e, f, g, r). Secs. 4(i) and 303(r) of the Communications Act endow the Commission with authority to make rules and regulations and issue such orders as may be necessary in the execution of its functions and to carry out the provisions of the Act. Sec. 303(b) authorizes the Commission, as the public convenience, interest or necessity requires, to prescribe the manner of the service to be rendered by stations, and Sec. 303(e) gives similar authority to regulate the kind of apparatus to be used with respect to its external effects. Sec. 303(g) provides, under the same standard of the public convenience, interest or necessity, that the Commission shall "study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest."

As has been shown, there was before the court at the time of the hearing plaintiffs' prayer for an interlocutory injunction and defendants' motions for a summary judgment and for dismissal of the complaint. Numerous affidavits were presented by the plaintiffs as well as by the plaintiff-inter-

venors, showing that irreparable damages would result if the order was permitted to take effect. Opposing affidavits were filed by the defendants and by CBS, the defendant-intervenor. There was also presented by the Commission a record of the proceedings, upon which its order was predicated.

At the conclusion of the hearing, the court took the conflicting motions under advisement and at the same time entered a temporary restraining order "restraining and suspending until further order of this court the promulgation, operation and execution of the order of the Federal Communications Commission adopted October 10, 1950, effective November 20, 1950." As a basis for this order the court entered findings of fact, including the finding, among others, that irreparable damages would result to plaintiffs and intervenors unless the Commission's order was restrained and suspended during the consideration and determination of the issues before the court, and that such temporary suspension would be in the public interest.

The order sought to be set aside has been the subject of attack on many fronts, which may be generally classified under two contentions, (1) that the order is contrary to the public interest, and (2) that its adoption represents an arbitrary and capricious attitude on the part of the Commission. Under these two general categories there are, of course, many subsidiary issues. The defendants concede that RCA has an interest which permits the maintenance of the instant suit, but that there is an absence of such interest on the part of the other plaintiffs, as well as on the part of the intervening plaintiffs. For the purpose of this decision, we shall assume that all the plaintiffs, as well as the intervenors, are properly before the court.

After listening to many hours of oral argument by able counsel representing the respective parties, we formed some rather definite impressions relative to the merits of the order, as well as the proceedings before the Commission upon which it rests. And our reading and study of the numerous and voluminous briefs with which we have been favored have not altered or removed those impressions. Also, in studying the case, we have been unable to free our minds of the question as to why we should devote the time and energy which the importance of the case merits, realizing as we must that the controversy can only be finally terminated by a decision of the Supreme Court. This is so because any decision we make is appealable to that court as a matter of right and we were informed during oral argument, in no uncertain terms, that which otherwise might be expected, that is, that the aggrieved party or parties will immediately appeal. In other words, this is little more than a practice session where the parties prepare and test their ammunition for the big battle ahead. Moreover, we must give recognition to our limited scope in reviewing an order of an administrative agency. While citation of authority in this respect is hardly necessary, it may not be amiss to make reference to a few recent Supreme Court opinions.

In American Telephone & Telegraph Co. et al. v. United States et al., 299 U.S. 232, 236, 57 S.Ct. 170, 172, 81 L.Ed. 142, wherein the court had under review an order of the instant defendant Commission, the court stated: "This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. * * * it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse."

In Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 227, 63 S. Ct. 589, 87 L.Ed. 724, the Court of Appeals for this Circuit set aside the order of an administrative agency. The Supreme Court reversed and with reference to review provisions of administrative action, stated: "Under such provisions we have repeatedly emphasized the scope that must be allowed to the discretion and informed judgment of an expert administrative body. [Citing cases.] These considerations are especially appropriate where the review is of regulations of general application adopted by an administrative agency under its

rule-making power in carrying out the policy of a statute with whose enforcement it is charged." And further the court, referring to the judgment of the administrative agency, stated 318 U.S. at page 228, 63 S. Ct. at page 595, 87 L.Ed. 724: "That judgment, if based on substantial evidence of record, and if within statutory and constitutional limitations, is controlling even though the reviewing court might on the same record have arrived at a different conclusion."

More recently, in National Broadcasting Co., Inc. et al. v. United States et al., 319 U.S. 190, 224, 63 S.Ct. 997, 1013, 87 L.Ed. 1344, the court reviewed and sustained an order of the instant Commission, and in doing so stated: "The Regulations are assailed as 'arbitrary and capricious.' If this contention means that the Regulations are unwise, that they are not likely to succeed in accomplishing what the Commission intended, we can say only that the appellants have selected the wrong forum for such a plea. * * * Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. It is not for us to say that the 'public interest' will be furthered or retarded by the Chain Broadcasting Regulations. The responsibility belongs to the Congress for the grant of valid legislative authority and to the Commission for its exercise."

Thus, with our scope of review so firmly delineated, we turn to a brief statement, if that is possible, of the proceedings which culminated in the order under attack. The Commission for many years had considered the question of color television. CBS had formerly proposed a system, which was denied in 1947. The instant proceedings, or that part which related to color television, were initiated by the Commission's notice of July 11, 1949 of further proposed rule-making relative to color television. This notice proposed among other things to consider color television systems, provided that such systems met two criteria: first, that they operate in a six-megacycle channel (the frequency space allotted to black and white television broadcasting stations); and second, that the pictures be received on existing television receivers "simply by making relatively minor modifications in such existing receivers," and the notice provided, "following the closing of the record and the conclusion of oral arguments, the Commission upon consideration of all proposals, counter-proposals, and evidence in this proceeding will adopt such rules, regulations and standards as will best serve the public interest, convenience or necessity." In response to this notice, comments relating in whole or in part to color television were filed by numerous parties. CBS, RCA and CTI (Color Television, Inc.) were the only parties who appeared as proponents of their own color television systems.

The hearing, participated in by all members of the Commission, commenced September 26, 1949 and ended May 26, 1950. In all, fifty-three different witnesses were heard and 265 exhibits received. The transcript of the hearing covers 9717 pages. During the period from November 22, 1949 to February 6, 1950, extensive field tests were made of the three systems proposed. Progress reports concerning these tests were filed with the Commission by the three proponents during December 1949 and January 1950. Comparative demonstrations of the three proposed systems were made on different dates until May 17, 1950. In response to the Commission's notice, proposed findings and conclusions were filed by proponents of the three systems.

On September 1, 1950, the Commission issued its first report, in which it made detailed findings and conclusions concerning the three proposed color television systems and set forth minimum criteria which such a system would have to meet in order to be considered eligible for adoption. CTI is not a party to this proceeding and there is no occasion to refer to the findings as to its proposed system. We set forth in a footnote the basic findings as to the system

proposed by RCA and that "proposed by CBS.[1]

■ Notwithstanding the findings favorable to the CBS system, the Commission declined in its first report to adopt that system. Instead of and concurrently with its first report, the Commission issued a second notice of further proposed rulemaking, suggesting the adoption of bracket standards in the existing monochrome television system and invited interested parties and all manufacturers to submit comments on the proposal. This proposal embodied a method by which brackets would be incorporated in the receivers thereafter manufactured so as to permit such receivers to receive black and white pictures from present transmissions as well as color transmission by CBS. The stated purpose of this proposal was to preserve the status quo on compatibility.[2] Maintaining the status quo on compatibility required the construction of receivers capable of receiving field sequential color transmissions in black and white. Comments upon the proposed bracket standards were received from thirty-three interested parties and television receiver manufacturers which disclosed an almost unanimous opinion on the part of manufacturers and other interested parties that such a system was not capable of being produced within the time limits fixed by the Commission.

On October 4, 1950, RCA filed a petition requesting the Commission to view the improvements made in the performance of the RCA color system between December 5, 1950 and January 5, 1951, and that the Commission view further experimental broadcasts of the three proposed color systems during the period to June 20, 1951, before reaching a final determination with respect to color standards. This request by RCA was denied, and on October 10, 1950, the Commission issued its second report, which concluded that the field sequential

1. As to RCA:

"(1) that the color fidelity of the RCA picture is not satisfactory and that there appears to be no reasonable prospect that the defects can be overcome;

"(2) that the texture of the RCA color picture is not satisfactory and that it is difficult to see how this defect can be eliminated;

"(3) that the receiving equipment utilized by the RCA system is exceedingly complex and that there is no assurance, even if the tri-color tube is successfully developed, that the RCA receivers will not continue to be unduly complex and difficult to operate;

"(4) that the equipment which RCA utilizes at the transmitting station is exceedingly complex and there is no assurance that satisfactory commercial type station equipment can be built;

"(5) that the RCA system is much more susceptible to certain kinds of interference than standard black-and-white or the CBS color system;

"(6) that there is not adequate assurance of RCA's ability to network color of proper quality over existing facilities; and

"(7) that the RCA system has not been sufficiently field tested."

As to CBS:

"(1) that CBS produces a color picture that is 'most satisfactory from the point of view of texture, color fidelity and contrast';

"(2) that the CBS receivers and station equipment 'are simple to handle' and within the economic reach of the public;

"(3) that though the CBS system is susceptible to flicker to a greater degree than standard black-and-white, the problem is not serious since flicker, which results from brightness, does not appear at the brightness level which is adequate for home use;

"(4) that while the CBS system has less 'geometric resolution' than black-and-white, the addition of color more than outweighs this loss, and that the black-and-white pictures produced from CBS color are acceptable; and

"(5) that while as a practical matter the apparatus now used by the CBS system is limited either to projection receivers of unlimited size or direct-view pictures of 12½ inch size, this size limitation will be eliminated if and when a commercial tri-color tube is successfully developed, and that in any event the public might well prefer a 12½ inch color picture to a 16 inch black-and-white picture and should not be deprived of that choice."

2. The term "compatibility" describes a situation in which no change whatever is required in existing receivers in order to enable them to receive as black and white picture a picture transmitted in color.

color system should be adopted. No testimony, oral or written, was received by the Commission in the interim between the issuance of its first and second report.

In its second report (issued October 10, 1950) the Commission, with reference to its first report, stated: "The Report stated that in the Commission's opinion, the CBS system produces a color picture that is most satisfactory from the point of view of texture, color fidelity and contrast. The Commission stated that receivers and station equipment are simple to operate and that receivers when produced on a mass marketing basis should be within the economic reach of the great mass of purchasing public. The Commission further found that even with present equipment the CBS system can produce color pictures of sufficient brightness without objectionable flicker to be adequate for home use and that the evidence concerning long persistence phosphors shows that there is a specific method available for still further increasing brightness with no objectionable flicker. Finally, the Commission pointed out that while the CBS system has less geometric resolution than the present monochrome system the addition of color to the picture more than outweighs the loss in geometric resolution so far as apparent definition is concerned."

Simultaneously with the second report the Commission entered the order under attack, amending the Commission's Standards of Good Engineering Practice, to provide for standards of color television transmission in accordance with the field sequential system (CBS system) effective November 20, 1950. Commissioners Sterling and Hennock dissented from the Commission's second report. On the date of the issuance of its second report, the Commission also denied the petition of RCA to postpone a final determination of the color proceedings and to have further demonstrations of the three proposed color systems.

While the findings of the Commission are severely criticized, it is not contended in the main that they are not supported by substantial evidence. It is pertinently pointed out, however, that a number of critical findings are based upon evidence which was taken in the earlier stage of the proceeding which is not representative of the situation as it existed at the time the findings were adopted. Admittedly, much progress was made during the latter portion of the hearings and, as claimed, after the hearings closed, in the development of a compatible system of color television. Particularly was such progress made by RCA, and as we view the situation the most plausible contention made by plaintiffs is that the Commission abused its discretion in refusing to extend the effective date of its order so that it might further consider the situation, and particularly the improvement which it is claimed had been made by RCA and others.

On the merits of the case, however, with which we are directly confronted by reason of defendants' motion for a summary judgment, much of plaintiffs' argument—in fact, the major portion of it—is predicated upon matters outside the record made before the Commission, and without going into too much detail we think it relevant to refer to some of such matters. While many affidavits offered by the plaintiffs as well as the intervening plaintiffs are proper, no doubt, to show damage in support of their asserted right to an injunction, many of them go far beyond this purpose and contain a recitation of alleged facts directly in conflict with the findings made by the Commission. Typical of such affidavits is that of Dr. C. B. Jolliffe, Executive Vice President in charge of the RCA Laboratories. His affidavit, in addition to showing damages which will be sustained by RCA as a result of the order, goes extensively into the alleged merits of the RCA system, the alleged demerits of the CBS system and the alleged errors committed by the Commission in reaching its decision. And much of plaintiffs' argument is predicated upon matters brought before the court in this fashion. In our view, such asserted facts are not properly before the court. A consideration of such matters would in effect amount to a trial de novo, which we are without power to grant. Thus, much of plaintiffs' argument, predicated upon such immaterial matter, appealing as it is, must be discarded.

■ Another segment of evidence upon which much reliance is placed is the report made by the so-called Condon Committee. Dr. Edward U. Condon, Director of the National Bureau of Standards of the United States Department of Commerce was, under date of May 20, 1949, requested by the Chairman of the Senate Committee on Interstate and Foreign Commerce to organize a committee to give "sound, impartial, scientific advice" on color television. Dr. Condon was the head of this committee, which included a group of scientific persons of repute, none of whom were employed by or had any connection directly or indirectly with any radio licensee or radio-equipment manufacturer. The report of this committee was released July 10, 1950, and considered at length the three color systems which had been proposed, and analyzed the present and potential performance of those systems. The report discloses that it took into consideration, among other matters, the testimony and demonstrations given before the Commission in the instant proceedings. No doubt this report refutes numerous of the findings made by the Commission and gives a far more favorable appraisement of the RCA system than that attributed to it by the Commission. Whether this report was considered by the Commission we do not know, but it is not referred to in the Commission's reports or its findings. As stated, this report was made to Congress, and we suppose a court could take judicial notice of it for some purposes, but again, in our view, it cannot be considered here for the purpose of impeaching the order of the Commission or the proceedings had before it. After all, Congress has conferred upon the Commission and charged it with the responsibility of conducting hearings and in reaching its own independent conclusions predicated thereon.

■ Another matter somewhat akin to those which we have just discussed was sought to be injected into this hearing by Pilot Radio Corporation, a plaintiff-intervenor. At the request of Pilot, two subpoenas duces tecum were issued out of this court on November 8, 1950, one addressed to the Commission and the other to CBS, requiring the production at the hearing in this matter of certain letters, documents, etc., described in said subpoenas. In response to the subpoenas the requested material was produced by the parties to whom the subpoenas were directed and lodged with the clerk of this court. At the same time, a motion was made to quash the subpoenas on the basis that the produced material was irrelevant and immaterial. The matter produced in the main consists of an exchange of letters between Honorable Edwin C. Johnson, Chairman of the Senate Interstate and Foreign Commerce Committee, and the Commission or members thereof, as well as correspondence exchanged between Senator Johnson and the officials of CBS. In addition, there was offered in evidence at the time of the hearing an exchange of telegrams or letters between Senator Johnson and counsel for Pilot. We are advised by counsel that the purpose of these letters and telegrams is to show "that constant and vigorous pressure exerted by the Chairman" was responsible for the Commission's asserted precipitate action. The matter thus sought to be injected is, of course, no part of the record made before the Commission and it cannot be properly considered here. In this connection, we should point out that neither Pilot nor any other intervenor nor plaintiffs make any charge or allegation in their pleadings that the Commission in making its order was influenced, cajoled or coerced by Senator Johnson or anybody else. In fact, other than the incident under discussion, there is not even an intimation by any of the interested parties that the Commission acted other than in good faith and in discharge of what it considered to be its statutory duty. The motion to quash these subpoenas duces tecum not heretofore passed upon is allowed.

■ Another matter which perhaps should be mentioned arises from plaintiffs' contention that the Commission improperly relied upon the testimony and assistance of one of its staff engineers who it is asserted was an interested party because he was the inventor of an automatic switch usable with a non-compatible system such as that proposed by CBS. The witness was not

the owner of and had no financial interest in the patent. He demonstrated the device on the record, to which an objection was made; however, no objection was made to his further testimony or participation in the proceeding. In fact, it appears that the matter was not again mentioned until raised in this court. It appears to us that the interest of the witness if it had any relevancy went to the weight or credit to be given his testimony, and that this was a matter for the determination of the Commission. In any event, it furnishes no basis for invalidating the Commission's order.

In the view we take of the case, there is no evidence under the pleadings which this court could properly hear. We take this view notwithstanding the suggestion made by counsel for RCA in oral argument and reiterated in its brief, that RCA might desire to introduce witnesses at a final hearing. We gather from the suggestion made that such testimony would be offered for the purpose of showing current developments, which we suppose means developments since the entry of the order, which have been called to the attention of the Commission and which it refuses to consider. Plaintiffs disclaim that this would constitute a trial de novo. With this contention we do not agree. We reiterate that under well established principles our function is to hear and determine the questions before us solely on the record made before the Commission.

Thus, as we evaluate the situation, there are two courses open, (1) to allow defendants' motion for a summary judgment, and (2) to vacate the order and send the proceeding back to the Commission for further consideration in view of recent developments in the color television field as well as the rapidly changing economic situation. A pursuance of the latter course, assuming we have such authority, of which there may be doubt, would inevitably result in the prolongation of the controversy which badly needs the finality of decision which can be made only by the Supreme Court. In other words, the interests of all, so we think, will be better served with this controversy on its way up rather than back from whence it comes.

Even though we propose to allow defendants' motion for a summary judgment, it does not follow that the temporary restraining order heretofore entered should not remain in effect. In fact, we are definitely of the view that it should, until such time as the controversy is before the Supreme Court. While there may appear to be some inconsistency in pursuing this course, we think such procedure is within our discretion. In National Broadcasting Co. v. United States, D.C., 44 F.Supp. 688, a statutory court under circumstances quite similar to those here held it was without jurisdiction to review an order of the Commission, and dismissed the complaint. Even so, it granted a stay until the matter could be appealed to the Supreme Court. Holding that the District Court had jurisdiction the Supreme Court reversed. 316 U.S. 447, 62 S.Ct. 1214, 86 L.Ed. 1586. In doing so, it suggested, 316 U.S. at page 449, 62 S.Ct. at page 1215, 86 L.Ed. 1586, "the stay now in effect will be continued, on terms to be settled by the court below." Thereupon, the case was tried by the District Court on its merits, a summary judgment allowed in favor of the defendants and the complaint again dismissed. And again the Commission's order was stayed pending appeal to the Supreme Court, and this time the judgment of the court below was affirmed. 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344. Insofar as we are able to discern from that opinion, the stay order allowed by the District Court remained in effect until the case was finally decided by the Supreme Court.

Thus concluding that the matter of a further stay of the Commission's order is discretionary, we shall state some of the reasons which move us to preserve the status quo. Of the nine million black and white television receivers in the hands of the public, there are none capable of receiving a picture either in color or black and white, broadcast under the proposed standards. In order to receive a black and white picture, it is necessary that a receiver be equipped with an adapter estimated to cost $50.00, plus the expense of installation. In other words, it would cost the American public nearly one-half billion dollars to

equip existing sets to receive, under the proposed system, black and white pictures, and even then admittedly they would be of a grade inferior to present black and white pictures. In addition, in order to receive a picture in color, it will be necessary to add to an existing receiver a converter, estimated to cost about $100.00, plus the expense of installation. Thus, this will cost the public nearly one billion dollars. In other words, upon an expenditure by the public of one and one-half billion dollars, adapters and converters can be added to existing receivers so as to receive, under the proposed system, pictures in black and white and in color.

But this is only a part of the story insofar as it relates to the public. It was here stated in oral argument and not disputed that there are no adapters or converters on the market and that manufacturers would require a period of from six to eight months before they could be made available. So it seems reasonable to conclude that if the instant order was now in effect, there would be no broadcasting under the proposed standards for many months, for the simple reason that there would be no sets capable of receiving such programs. And it does not square with common sense to think that manufacturers would rush into the business either of manufacturing adapters and converters for existing sets **or** manufacturing sets with built-in adapters and converters while this controversy is pending. And to maintain that the public in any considerable number would purchase adapters and converters, assuming they were available, under the existing state of doubt and uncertainty, is to cast a reflection on the intelligence of people.

Another matter which does not escape our attention is the insistence displayed by the defendants, including CBS, that this order at all hazards must become effective November 20, 1950, the date fixed by the Commission. This apparently was a magic date, so much so that defendants opposed a postponement until this court could have an opportunity to study and decide the issues presented. Perhaps the most substantial attack made upon the Commission's order is the adoption of standards which call for an incompatible system which, as admitted by all the parties including the defendants and CBS, is less desirable than a compatible system. Of course, the Commission's position in this respect is predicated upon its conclusion that no satisfactory compatible system was demonstrated, while the incompatible system which it approved was satisfactory. And the main argument against a stay of the order is that incompatability is and will rapidly increase as the public continues to purchase existing receivers. As is stated in defendants' brief, "The grant by this court of an interlocutory injunction will encourage the increased sale of receivers requiring outside adaption to receive CBS color transmission in black and white. The difference between this cost and the cost of adapting receivers at the factory is the price the American public will pay if the Commission's decision is finally upheld." This argument is based on the assumption that the Supreme Court will sustain the validity of the order. It ignores a contrary possibility. Certainly this court is possessed of no such omnipotence, and we doubt if the Commission is. Even if the order was in effect, the owners of existing receivers could not within the next several months obtain the equipment which would enable them to receive the authorized broadcasts. But assume that they could and did so. Where would the public find itself in the event the order should be held invalid by the Supreme Court?

In our view, the public interest in this matter has been magnified far beyond its true perspective. We are even told that this suit is a contest between television manufacturers and the public on some theory that it is to the financial gain of the former to refuse and delay the manufacture of television sets capable of receiving the broadcast authorized. Any merit in this contention, so we think, is completely overshadowed by what appears to be evident, that is, that the contest is mainly between two great broadcasting systems for a position of advantage in this rapidly developing field of television.

Another reason why this order should be stayed is the existing economic

situation, recognized by Commissioner Sterling in his dissenting opinion, wherein he stated, "The problems confronting manufacturers today in terms of production, procurement and manpower to meet the demands of national defense are serious ones. * * * It is well known that there are serious shortages of tubes and resisters as well as basic materials. * * * Moreover, in many instances industry has been required to divert its TV engineering experts to problems of production for defense because of the close relationship of TV techniques to radar and other electronic devices the government requires." It is a matter of common knowledge that the situation thus described becomes more acute with each passing day, and the prospects are that it will be far worse before it is better. It is hardly conceivable that either the Commission or the government would under such circumstances desire, much less insist, that the order in controversy be made effective.

Our purpose is to restrain the effective date of the order until the aggrieved parties have had an opportunity to perfect an appeal to the Supreme Court. Therefore, the temporary restraining order heretofore entered will remain and continue in force until April 1, 1951, or until terminated by the Supreme Court. And we re-adopt the findings heretofore made in support of the continuation of such order.

▮▮▮ A summary judgment will be entered in favor of the defendants and against the plaintiffs, and the complaint dismissed. No testimony having been heard or considered other than the record made before the Commission, no findings are required in support of such judgment.

LA BUY, District Judge (dissenting).

It is conceded by all and it is self-evident that the best system of color television is a compatible one; that is, a system requiring no change whatever in existing receivers for the reception of black and white as well as color pictures. Indeed, compatability is the coveted goal of all engineers and scientists engaged in the television industry.

In its order of October 11, 1950 (F3), the Commission stated: " * * * that the state of the television art is such that new ideas and new inventions are matters of weekly, even daily occurrence; * *." And again, in recognizing the rapid developments in the field, the Commission said (B92, First Report): "The third matter we refer to is the possibility of new color systems and improvements in existing color systems which have been informally called to our attention since the hearings closed. Of course, these are not matters of record and cannot be relied on in reaching a decision unless the record is reopened. In considering these developments the Commission is aware that the institution of these proceedings stimulated great activity in the color field and that since fundamental research cannot be performed on schedule, it is possible that much of the fruit of this research is only now beginning to emerge. * * *"

Commissioner Sterling, dissenting with what he characterized the "premature action taken by the majority", also stated among other reasons for his disapproval of the action of the Commission "new developments came fast in the closing days of the hearing and immediately thereafter". Commissioner Hennock, who also disagreed with the Commission's speedy action, expressed her views as follows,

"* * * in the light of the progress made in the development of color television since the start of the instant proceeding, I think it is essential to defer final decision in this matter until June 30, 1951.

"* * * It is of vital importance to the future of television that we make every effort to gain the time necessary for further experimentation leading to the perfection of a compatible color television system. * * *"

In its First Report, the Commission stated:

"* * * two difficult courses of action are open to the Commission. The first course of action is to reopen the record * * * The second course of action is to adopt a final decision.

"The advantage of the first course of action is that the Commission would not be compelled to speculate as to an important basis for its decision . . . The disadvantage is that it would postpone a final decision and hence would aggravate the compatability problem. * * * The advantage of the second course of action is that it would bring a speedy conclusion to the matters in issue and would furnish manufacturers with a real incentive to build a successful tricolor tube as soon as possible. * * * The disadvantage is that the Commission's determination on an important part of its decision would be based on speculation and hope rather than on demonstrations."

On October 4, 1950 RCA petitioned the Commission to review the progress made in developing and perfecting the various systems before a final determination. It offered to show the Commission improvements in certain phases of their system about which the Commission expressed doubts. The Commission denied the petition giving among other reasons that "delay in reaching a determination * * * would not be conducive to the orderly and expeditious dispatch of the Commission's business".

The Commission recognized and the record before the Commission is replete with evidence that rapid strides are being made toward the perfection of a fully compatible system. There is ample basis for the conclusion that the scientists laboring in the laboratories of the industry may soon resolve the problem of compatibility. In view of the admittedly fluid state of the art, it is difficult to understand why the Commission refused to hear additional evidence and chose instead a course of action, using its own words, based "on speculation and hope rather than on demonstrations."

It is estimated that the cost of conversion to the new standards set by the Commission will cost the public in excess of a billion dollars. If hope and speculation may lawfully be substituted for evidence as a foundation for an important part of its decision, it was an abuse of discretion not to have indulged this speculation and hope in the public interest. The Commission chose a speedy determination of an issue of great public interest in preference to the more patient consideration which the magnitude of the question warranted. To prohibit the broadcast of color in completely compatible systems, whether it is RCA or any other fully compatible system, is a bar to competition between compatible and incompatible color and is unreasonable and arbitrary.

It is my opinion the Commission's precipitous action in entering the order, the impact of which will require owners of televisions sets to install equipment at a cost of many hundreds of millions of dollars, and its refusal to hear additional evidence clearly indicates an abuse of discretion and constituted action which was arbitrary and capricious.

I would overrule the motion to dismiss and for a summary judgment and would restrain the enforcement of the order.