KONIAG, INC., et al.,
Plaintiffs,

v.

Thomas S. **KLEPPE**, Secretary of the Interior, Defendant.

Civ. A. Nos. 74–1061, 74–1134, 74–1790 to 74–1795, 75–452, 75–485 and 75–1097.

United States District Court, District of Columbia.

Nov. 14, 1975.

**1364**

Edward Weinberg, Frederick D. Palmer, Frederick L. Miller, Jr., John P. Meade, Stephen M. Truitt, Washington, D. C., Allen McGrath, Anchorage, Alaska, F. Conger Fawcett, San Francisco, Cal., for plaintiffs.

Herbert Pittle, Atty., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

GESELL, District Judge.

The eleven plaintiffs have filed separate complaints challenging decisions of the Secretary of the Interior which found each of them ineligible to take land and revenues under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 et seq. (Supp. III, 1973). When it appeared at a status conference that these separate cases raise a number of questions common to one or more of the complaints, plaintiffs and defendant agreed that the cases should be consolidated to hear those questions which could be adequately presented on cross-motions for summary judgment.[1] This was done. The records of the separate administrative hearings involving each of the villages held before the Secretary have been filed with the Clerk of Court to provide necessary support for references to matters raised by the summary judgment motions. In addition, various depositions were taken relevant to certain issues and these are also before the Court. Following elaborate briefing and extended oral arguments continuing over two days the common issues are now before the Court for determination.

Before attempting to identify the various contentions of the parties it is necessary to delineate the nature of the settlement with Alaska Natives accomplished through the Alaska Native Claims Settlement Act and to describe the procedures which were adopted by the Secretary through regulations to carry out his responsibilities under the Act.

The Alaska Native Claims Settlement Act of December 18, 1971, sought to accomplish a fair, rapid settlement of all aboriginal land claims by Natives and Native groups of Alaska without litigation. The history of the legislation is contained in the Conference Report, S.Rep.No.92–581, 92d Cong., 1st Sess., U.S.Code Cong. & Admin.News 1971, p. 2192. Impetus for this legislative settlement came from a realization that the aboriginal claims which had long existed created serious obstacles to development of Alaska's newly discovered oil and other natural resources and raised questions as to Alaska's ability to take dominion over public lands that might otherwise be chosen by it under the provisions of the Alaska Statehood Act and other legislation. Under the Settlement Act, 40 million acres of land and $962,-200,000 were to be disbursed to regional corporations and villages that qualified. In exchange, all aboriginal titles and claims were extinguished. The Secretary of the Interior was given the responsibility to administer the complex program outlined in the legislation. This was a difficult and onerous task since it was to be performed with finality in a brief period without creating a reservation system or lengthy wardship or trusteeship. Adding to this difficulty is the fact that the Act lacks precision in a number of respects and contains ambiguities which are not clarified by the legislative history.

---

1. Other issues such as the sufficiency of the evidence in an individual proceeding to support a particular finding by the Secretary were reserved until it could be determined whether or not the common issues, or any of them, are dispositive of the underlying controversy.

The land and funds made available through the Act are to be divided among thirteen regional corporations in which Natives hold stock and whatever Native villages are found eligible. Congress gave recognition to the obvious fact that some Alaska Natives had abandoned traditional life styles and villages. Settlement of claims with those Natives was to be confined to their entitlement to stock in the Native Regional Corporations which were funded by the statute, 43 U.S.C. §§ 1602(g), 1605, 1606, 1608, 1611 (Supp. III, 1973). In addition, section 12(a) of the Act authorizes Native villages of 25 or more Natives in existence on April 1, 1970, the United States census date, to select out of the public domain substantial tracts of surrounding land. This selection is to be made as specified in section 14, which provides that villages are entitled to acreages depending upon the population of each village and authorizes conveyance of from 69,120 acres to villages having between 25 and 99 Natives to as many as 161,280 acres to villages having 600 or more Natives. Section 12 (a), however, provides that no village corporation may select more than 69,120 acres from the National Wildlife Refuge System or from a National Forest. This village land ownership, among other things, assured the continued existence of the traditional life style and economies of the Natives.

Section 3(c) of the Act, 43 U.S.C. § 1602 (Supp. III, 1973), defines "Native villages" as:

"Native village" means any tribe, band, clan, group, village, community, or association in Alaska listed in sections 1610 and 1615 of this title, or which meets the requirements of this chapter, and which the Secretary determines was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives.

Sections 11(b)(1) and 16(a), 43 U.S.C. §§ 1610(b)(1), 1615(a) (Supp. III, 1973), list 215 geographic locations which were considered to be villages presumptively eligible to receive lands and other benefits. Section 11(b)(2), 43 U.S.C. § 1610(b)(2) (Supp. III, 1973), provides:

Within two and one-half years from December 18, 1971, the Secretary shall review all of the villages listed in subsection (b)(1) hereof, and a village shall not be eligible for land benefits under section 1613(a) and (b) of this title, and any withdrawal for such village shall expire, if the Secretary determines that—

(A) less than twenty-five Natives were residents of the village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance; or,

(B) the village is of a modern and urban character, and the majority of the residents are non-Native.

Any Native group made ineligible by this subsection shall be considered under section 1613(h) of this title.

Villages that were not listed might also be eligible for benefits under the Act. Section 11(b)(3), 43 U.S.C. § 1610(b) (3) (Supp. III, 1973), provides:

Native villages not listed in subsection (b)(1) hereof shall be eligible for land and benefits under this chapter and lands shall be withdrawn pursuant to this section if the Secretary within two and one-half years from December 18, 1971, determines that—

(A) twenty-five or more Natives were residents of an established village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance; and

(B) the village is not of a modern and urban character, and a majority of the residents are Natives.

Prior to engaging in the review of the 215 places listed in the Act and the numerous additional places not listed in the Act which sought recognition, the Department of the Interior, under the Secretary's direction, conducted rule-making procedures which culminated in the adoption of regulations to govern the mechanics of the decision-making process on Alaska Native village eligibility, 43 C.F.R. Part 2650 *et seq.*, adopted May 30, 1973, effective July 2, 1973, 38 Fed. Reg. 14218.

In implementing these requirements of the Act, the Secretary promulgated the following criteria (43 C.F.R. § 2651.2):

2651.2 (b) Except as provided in subparagraph (4) of this paragraph, villages must meet each of the following criteria to be eligible for benefits under sections 14(a) and (b) of the act:

(1) There must be 25 or more Native residents of the village on April 1, 1970, as shown by the census or other evidence satisfactory to the Secretary. A Native properly enrolled to the village shall be deemed a resident of the village.

(2) The village shall have had on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life style and at least 13 persons who enrolled thereto must have used the village during 1970 as a place where they actually lived for a period of time. *Provided,* That no village which is known as a traditional village shall be disqualified if it meets the other criteria specified in this subsection by reason of having been temporarily unoccupied in 1970 because of an act of God or government authority occurring within the preceding 10 years.

(3) The village must not be modern and urban in character. A village will be considered to be of modern and ur-ban character if the Secretary determines that it possessed all the following attributes as of April 1, 1970:

(i) Population over 600.

(ii) A centralized water system and sewage system that serves a majority of the residents.

(iii) Five or more business establishments which provide goods or services such as transient accommodations or eating establishments, specialty retail stores, plumbing and electrical services, etc.

(iv) Organized police and fire protection.

(v) Resident medical and dental services, other than those provided by Indian Health Service.

(vi) Improved streets and sidewalks maintained on a year-round basis.

(4) In the case of unlisted villages, a majority of the residents must be Native, but in the case of villages listed in sections 11 and 16 of the act, a majority of the residents must be Native only if the determination is made that the village is modern and urban pursuant to subparagraph (3) of this paragraph.

The Secretary's regulations also required that the Juneau, Alaska, Area Office of the Bureau of Indian Affairs review and make determinations not later than December 19, 1973, on all applicant Native village corporations' eligibility for benefits as Native villages under the Act. Prior to the determinations, the Area Director was required to publish proposed decisions, 43 C.F.R. §§ 2651.2(a)(1), (2). Those decisions became final unless protested within 30 days of their date of publication by "any interested party," 43 C.F.R. § 2651.-2(a)(3). Upon receipt of a protest by an interested party, the Area Director was required to examine and evaluate it and within 30 days render a final decision, 43 C.F.R. § 2651.2(a)(4). These

Area Director decisions automatically became final unless an "aggrieved party" appealed to the Secretary of the Interior by filing a notice with the Ad Hoc Board [2] within 30 days of publication (43 C.F.R. § 2651.2(a)(5)). The Secretary reserved to himself personally the ultimate decision in each case (43 C.F.R. § 2651.2(a)(5)).

Not all cases were appealed. If an appeal was taken a record on appeal was developed in the following fashion. The Board assigned each appeal to a Department of the Interior administrative law judge for a full *de novo* adversary hearing on a record. At the hearings the "aggrieved" parties were represented mainly by an attorney from the Solicitor's Office of the Department of the Interior. Motions challenging standing were heard and evidence taken. The administrative law judges received proposed findings of fact and heard argument from the parties.

Thereafter, over the protest of plaintiffs, all subsequent proceedings were *in camera*. The decisions of the administrative law judges were forwarded *in camera* to the Board without being served on the villages. The Board then made formal decisions in each case and submitted these to the Secretary *in camera* without service on the villages. Following this, Secretary consulted members of his staff and decided to accept the Board's decisions in each case. It was only at this stage that the villages learned of the result.

The entire process resulted in the following determinations by the Secretary. Of the 215 villages listed in section 11(b)(1) and section 16(a) of the Alaska Native Claims Settlement Act, 191 were determined to be eligible to receive land benefits under the Act, and 17 were determined to be ineligible. Thirty-one villages not listed in the Act applied for a determination of eligibility to receive land benefits, and 12 of these were determined to be eligible, while 19 were determined to be ineligible. Thus a total of 203 villages have been determined to

be eligible for benefits under the Act; 191 listed and 12 unlisted.

In this consolidated case, three of the plaintiffs (Uyak, Salamatof and Pauloff Harbor) were "listed" villages, and village corporations were established to claim land and benefits under the Act. The Area Director confirmed that they were in fact qualified. Upon appeal by the Fish and Wildlife Service, these plaintiffs ultimately were determined by the Secretary not to meet the statutory standards for eligibility as Native villages.

The remaining eight plaintiffs were not listed as villages in section 11 of the Act. They each applied to the Area Director for certification as eligible villages pursuant to section 11(b)(3). The Area Director found them qualified. Upon the filing of protests by the Fish and Wildlife Service, the National Forest Service, or the State of Alaska, it was finally determined that they were not in fact eligible as Native villages because they did not meet the conditions specified in that section of the Act and the implementing regulations.

Accordingly, each of these eleven cases was brought to obtain judicial review of those adverse decisions by the Secretary.

The plaintiffs contend that Fish and Wildlife, Forest Service and the State of Alaska were not in fact parties aggrieved and thus lacked standing to appeal, so that the proceedings before the administrative law judges in each instance and the Board and the Secretary are consequently of no force and effect. Alternatively, they urge that the proceedings on appeal were defective in a number of respects and constitute a denial of due process. In this respect they object, among other things, to the *in camera* treatment of the recommended decisions of the administrative law judges and the Board, and also urge that the proceedings were tainted because of congressional interference. Further objections are raised concerning the legality of the Secretary's regulations in some instances and the asserted failure

2. Name later changed to Alaska Native Claims Appeal Board, hereinafter ANCAB or the Board.

of the Secretary properly to carry out his decisional responsibilities. All of these matters will be considered herein.

### I. *Standing.*

Common to all cases is the threshold question whether the State of Alaska, the United States Fish and Wildlife Service and the National Forest Service had standing as aggrieved parties to appeal determinations made by the Alaska Bureau of Indian Affairs Area Director that each of the plaintiff villages was qualified for benefits under the Act. *See* 43 C.F.R. §§ 4.7000, 2651.2(a)(5). The Fish and Wildlife Service and the Forest Service raise a common question of standing. Basically, the Services argue that since Congress did not intend for an unqualified village to be awarded land from a wildlife refuge or a national forest they have standing as the agencies responsible for these refuges and forests to challenge the eligibility of a village which either will be required or may choose to take some land from their respective domains.

It is true, as plaintiffs argue, that Congress put careful safeguards in the statute designed to minimize the possible adverse effects of such takings. The Alaska Native Claims Settlement Act provides very specifically for protection of the interests of the Fish and Wildlife Service, the Forest Service and the State of Alaska in deference to the potential conflict between village claims and the national wildlife refuge system or the national forests.

Plaintiffs are at some pains to point out the scope and nature of these protections. With respect to the Fish and Wildlife Service, the Act first of all limits the amount of refuge lands which can be selected by a Native village. Alaska Native Claims Settlement Act, § 12(a)(1), 43 U.S.C. § 1611(a)(1) (Supp. III, 1973). It provides for expansion of the boundaries of a national wildlife refuge to replace acreage selected by Native villages out of the refuge. ANCSA, §§ 11(a)(3)(A), 17(a)(7)(I),

and 22(e), 43 U.S.C. §§ 1610(a)(3)(A), 1616(a)(7)(I), 1621(e) (Supp. III, 1973). It requires that if land from a refuge is patented to a Native village, and the land is ever sold, provision must be made in the patent for a right of first refusal in the United States to buy back those lands. ANCSA, § 22(g), 43 U.S. C. § 1621(g) (Supp. III, 1973). It further provides that every patent issued which transfers refuge lands to Natives must contain a provision that such lands ". . . remain subject to the laws and regulations governing use and development of such Refuge." ANCSA, § 22(g), 43 U.S.C. § 1621(g) (Supp. III, 1973).

With respect to Forest Service, the Act similarly limits the amount of acreage in a national forest which any Native village may select. ANCSA, § 12(a)(1), 43 U.S.C. § 11(a)(1) (Supp. III, 1973). It also provides for ". . . orderly, planned and [environmentally] compatible . . ." planning of lands received by the Natives from national forests (ANCSA, § 17(a)(7)(I), 43 U.S.C. § 1616(a)(7)(I) (Supp. III, 1973)), and provides that national forest lands selected by a Native village shall be subject to Forest Service management prior to conveyance (ANSCA, § 22(i), 43 U.S.C. § 1621(i) (Supp. III, 1973)). Finally, the statute requires that patents of national forest lands which are issued to Native villages under the Act shall contain extremely restrictive conditions on the use of said lands by the Natives, including a provision that ". . . such lands are [to be] managed under the principle of sustained yield and under management practices for protection and enhancement of environmental quality no less stringent than such management practices on adjacent national forest lands for a period of twelve years." ANCSA, § 22(k), 43 U.S.C. § 1621(k) (Supp. III, 1973).

■ Nonetheless, the Government's point is well taken that some presently immeasurable degree of disadvantage may result if an unqualified village ob-

tains authority over a portion of the lands now in the exclusive care of the United States and that this is sufficient to provide standing. Under the statutory scheme, many of the relevant facts cannot yet be determined, for example, which land will be selected by the villages, which land will be added to the National Wildlife Refuge System to replace that chosen by the villages (43 U.S.C. § 1621(e) (Supp. III, 1973)), or how the villages will in fact use and manage the land (*cf.* 43 U.S.C. § 1621 (g) (Supp. III, 1973)). The Government will not be held to an impossible burden of proof. That these and other facts are not now known with certainty does not render the Government's interest too remote or conjectural. Moreover, the Forest Service and the Fish and Wildlife Service have broad mandates to protect our forests and wildlife, *e. g.,* 16 U.S.C. §§ 551, 553; 16 U.S.C. § 742a *et seq.* The Court is particularly reluctant to deny standing to those most likely in fact to have a legitimate concern about these lands and to come forward to protect the public interest, especially where the effect of finding standing is simply to allow adversary proceedings to be held which, if properly conducted, could contribute to fair and informed decision making. Accordingly, the Court finds that the Forest Service and the Fish and Wildlife Service, rather than merely engaging in "an ingenious academic exercise in the conceivable," *United States v. SCRAP,* 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), have a sufficiently direct stake in the outcome to establish their standing to appeal as "parties aggrieved." *See United States v. SCRAP, supra; Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ However, the conclusion that these governmental entities had stand-

ing to appeal is not applicable in the cases of Anton Larsen Bay and Bells Flats, and the Court finds that in these two cases standing did not exist.[3] Each of these two villages had made extensive good-faith commitments not to take land from a wildlife refuge or national forest. Even the most theoretical harm was removed by these commitments, and the Court finds that it was only because of improper congressional interference *(see infra)* that the Fish and Wildlife Service appealed in these instances.

■ Two other plaintiff villages, Solomon and Alexander Creek, were challenged only by the State of Alaska. Alaska did not have standing. The State's only interest was the speculative possibility that at some later time for some undisclosed reason it might, under the Alaska Statehood Act, seek to have land patented to it that would be claimed by these villages. Congress was not unaware of this issue, for it excluded from the definition of "public lands" that could be taken by the villages any "land selections of the State of Alaska which have been patented or tentatively approved under section 6(g) of the Alaska Statehood Act, as amended (72 Stat. 341, 77 Stat. 223), or identified for selection by the State prior to January 17, 1969," 43 U.S.C. § 1602(e) (Supp. III, 1973). The failure of the State to bring itself within this statutory provision underscores the conjectural and attenuated nature of its interest here. Alaska had ample opportunity to select land but did not do so, and one does not have standing merely by appearing in a case for the purpose of keeping one's options open an indefinite period in the future.

Thus, in four of the cases, the appeals were not brought by a proper party and hence were unauthorized and invalid.

3. Moreover, in the case of Pauloff Harbor, there has arisen a factual dispute as to whether this village, if eligible, would be entitled to take land from a wildlife refuge. Since this cannot be resolved on cross-motions for summary judgment, the Court makes no determination concerning the standing of the Fish and Wildlife Service to appeal the Area Director's decision on Pauloff Harbor.

Accordingly, the final decision of the Bureau of Indian Affairs Area Director in the cases of Anton Larsen Bay, Bells Flats, Solomon and Alexander Creek must be reinstated.

## II. *The Fairness and Integrity of the Administrative Process.*

In the other seven cases the Court must now consider the plaintiffs' various challenges to the basic fairness and integrity of the appellate administrative proceedings. Two issues are of major concern. First, it is claimed that the Secretary, who reserved final decision to himself,[4] was prevented from making a rational decision on the records developed because the decisions of both the administrative law judges and the Ad Hoc Board were kept *in camera* and remained undisclosed to the parties until the Secretary had already reached his final decision. This process denied the villages the opportunity to bring to the Secretary's attention any exceptions or objections they might have had to the determinations below.[5] Significantly, although it is not necessary to show the prejudice in each instance, some of the cases were decided adversely to the villages by the Board and the Secretary on grounds that had never been raised before the administrative law judges and of which the parties were unaware until the Secretary announced the final result.

 The Government argues that there are no legal constraints on the Secretary as to the nature or format of the administrative proceedings. The Court finds this position to be without merit. First, plaintiffs herein had a statutory entitlement under the Act that could not be adversely affected without due process of law. The legislative criteria for village eligibility were clear, specific and objective, and any and all

qualified villages would be able to receive the designated benefits. Moreover, listed villages were presumptively eligible for benefits, and the unlisted villages in the instant proceeding assumed a comparable status once the Area Director had found them to be qualified. *See Garfield v. Goldsby,* 211 U.S. 249, 29 S.Ct. 62, 53 L.Ed. 168 (1908). Finally, this is not a situation in which benefits are provided through government largess. Rather, the *quid pro quo* to the Government under the Act was the extinguishment of all aboriginal land claims, and the villages were entitled to be heard on the inseparable issues of the abatement of their land titles and the compensation therefor. *Cf. Cameron v. United States,* 252 U.S. 450, 460–61, 40 S.Ct. 410, 64 L.Ed. 659 (1920); *United States v. Consolidated Mines & Smelting Co., Ltd.,* 455 F.2d 432, 441 (9th Cir. 1971); *Adams v. Witmer,* 271 F.2d 29, 32–33 (9th Cir. 1958). Under these circumstances, the Court concludes that plaintiffs had a sufficient property interest to come within the due process clause.

 Supporting plaintiffs' right to due process is section 2(b) of the Settlement Act, 43 U.S.C. § 1601(b) (Supp. III, 1973), which declares that "the settlement should be accomplished . . . with maximum participation by Natives in decisions affecting their rights and property." In light of this congressional directive, the Secretary was well advised to make provision in the regulations for adversary proceedings before an administrative law judge. However, the adversarial nature of the process at the initial stage could not be disregarded or forgotten at later stages. Once the Secretary chose to establish a multi-tiered administrative process and elected to reserve to himself the personal responsibility to make the ultimate de-

---

4. It is argued that the Secretary performed a purely ministerial act or residual function but this is not correct. He is bound by his own regulations and the decision was his and his alone.

5. Indeed, it appears that the Secretary did not even see the proposed findings of fact submitted by the villages to the administrative law judges.

cision, he was obligated to provide a consistent structure that did not frustrate basic notions of fairness, impartiality and informed and rational decision making. By unnecessarily foreclosing to himself knowledge of the Natives' contentions as to the underlying issues, the Secretary has deviated from this obligation.

■ The Government next urges that this defect was harmless error. Whether judged under the Administrative Procedure Act[6] or the more flexible due process concepts of fundamental fairness and a meaningful opportunity to be heard, the Government's contention must be rejected. It is absolutely clear on this record that the *in camera* procedures were inherently unfair and did not comport with the minimum requisite standards.

Closely related to this aspect is the pervasive influence of the so-called Dingell hearings. Honorable John D. Dingell, Chairman of the House Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, held so-called "oversight" hearings relating to the administration of the Alaska Native Claims Settlement Act on June 4, 5 and 12, 1974. A transcript of some 130 pages is of record. Numerous witnesses appeared representing different bureaus and sections of the Department of the Interior, including the Bureau of Indian Affairs and the Fish and Wildlife Service, and representatives of the Forest Service of the Agriculture Department. Of particular significance is the fact that among the witnesses was Kenneth Brown, who served as legislative counsel and chairman of the Alaska Task Force Working Committee of

the Department of the Interior and was one of the Secretary's two principal advisors who reviewed the cases personally with him at the time he made his decision in the plaintiffs' cases. The hearings took place during the time that the validity of certain claims being advanced by the plaintiffs was being litigated before the Secretary and followed upon earlier correspondence which the Congressman had addressed to various subordinates of the Secretary. The stated purpose of the hearings was to present a forum for discussing the implementation of the Act but in fact the Committee, through its chairman and staff members, probed deeply into details of contested cases then under consideration, indicating that there was "more than meets the eye." The entire rule-making process was re-examined, travel vouchers and other information were sought to probe the adequacy of the investigations made, all papers in the pending proceedings were demanded, the accuracy of data and procedures followed was questioned, and constantly the Committee interjected itself into aspects of the decision-making process. While representatives of Interior indicated they were very concerned about prejudice to the quasi-judicial administrative process, and the chair on several occasions denied that it was his purpose to pressure the agencies involved, Representative Dingell stated that he was obliged to confess that he had doubts as to whether the law was being properly carried out. On key issues now in dispute before the Court, representatives of the Government were obliged to take positions as to the interpretation of the Act. A strenuous effort was made by the chairman to encourage protest and appeals,

6. *See* 5 U.S.C. § 557(c) (1970); *Riss & Co. v. United States*, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951) (per curiam), *rev'g* 96 F.Supp. 452 (W.D.Mo.1950) (three-judge court); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), *order modified*, 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950); *Ohio Bell Telephone Co. v. Public Utilities Comm'n*, 301 U.S.

292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); *Western Union Division v. United States*, 87 F.Supp. 324, 334 (D.D.C.) (three-judge court), *aff'd per curiam*, 338 U.S. 864, 70 S.Ct. 148, 94 L.Ed. 530 (1949); *Muncie Broadcasting Corp.*, 15 Ad.L. 329 (F.C.C. 1964). *Compare Sofield Transfer Co.*, 115 M.C.C. 280 (1972).

coupled with comments indicating his clear impression that all that could be done was not being done and that some of the results being reached were contrary to congressional intent. It was following this experience that settlements arranged with two of the plaintiffs, Anton Larsen Bay and Bells Flats, were abandoned by the Department of the Interior because of the hearings. It should also be noted again that when the Secretary reached the crucial point of making his personal decision on the merits of cases that were investigated and critized by the Committee he had as one of his two immediate personal advisors Mr. Brown, who had been subjected to the intervention and subtle harassment of the Legislative Branch.

The leading decision on the issue of congressional interference with a quasi-judicial administrative proceeding is *Pillsbury Co. v. Federal Trade Commission,* 354 F.2d 952 (5th Cir. 1966). The *Pillsbury* doctrine has been approved in this jurisdiction. *D. C. Federation of Civic Associations v. Volpe,* 148 U.S. App.D.C. 207, 459 F.2d 1231, 1246–47 (1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972), *subsequent appeal,* 520 F.2d 451 (D.C.Cir. 1975); *see also Jarrott v. Scrivener,* 225 F.Supp. 827 (D.D.C.1964), and cases cited therein.

■ The Dingell hearings constituted an impermissible congressional interference with the administrative process. This situation presents a disturbing conflict between the Congress and the Executive Branch, and it is the responsibility of the Judiciary in this instance to prevent an impermissible intrusion by one branch into the domain of the other. It is no less the responsibility of the Court to protect the procedural due process rights of litigants and "to preserve the integrity of the judicial aspect of the administrative process." 354 F.2d at 964. It cannot be gainsaid that the "appearance of impartiality—

the *sine qua non* of American *judicial* justice—" was sacrified in this instance. *Id.* "[P]rivate litigants [have a right] to a fair trial and, equally important, [a] right to the appearance of impartiality, which cannot be maintained unless those who exercise the judicial function are free from powerful external influences," *id.* The appearance of justice was breached and while the complaining party is not required to shoulder the virtually impossible burden of proving whether and in what way the outcome before the agency was actually influenced by the congressional intrusion, the evidence before the Court indicates that the Dingell hearings indeed had a direct and demonstrable effect at least on the cases of Anton Larsen Bay and Bells Flats.

■ Because of these two factors, the appellate proceedings in all eleven cases must be invalidated and set aside. In four cases, the decision of the Bureau of Indian Affairs Area Director has already been reinstated, *see supra.* In the remaining seven cases the Court must now determine whether the appropriate course is to remand to the Department of the Interior for further proceedings or to accept the Area Director's decision as the last authoritative ruling that was untainted by these two defects. There is nothing before the Court to indicate that the effect of the Dingell hearings has been removed, and they did not occur so long ago that their influence can be presumed to have been dissipated. For this Court to allow further administrative proceedings to be held when the agency has failed to demonstrate the absence of any lingering effect would be to countenance a continuing violation of due process. Apart from this, Congress has been insistent, and properly so, upon a prompt resolution and settlement of the Natives' claims. Key deadlines still must be met by December of this year and the general purpose of the statute would be thwarted by the delays inherent in a remand, which could only proceed to proper conclusion when there was as-

surance that the congressional taint had been removed. Moreover, this is not a question of, in effect, removing the administrative body altogether from decision making, since there is an untainted decision by the Secretary's delegate, the Bureau of Indian Affairs Area Director, which can be reinstated. *Compare Federal Trade Commission v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Pillsbury, supra,* 354 F.2d at 965. Recognizing that the Government has a particular responsibility to the Natives at least of a quasi-trust character *(see infra)* and considering all of these factors, the Court will not remand but will in all cases reinstate the decision of the Area Director. *Cf. Radio Corp. of America v. United States,* 95 F.Supp. 660, 669 (N.D.Ill.1950) (three-judge court), *aff'd,* 341 U.S. 412, 71 S.Ct. 806, 95 L. Ed. 1062 (1951).

### III. *Remaining Issues.*

There are several remaining issues that were sharply contested, briefed and argued before the Court. Normally there would be no need to resolve such issues in view of the above holdings, but in the event that on appeal, if one is taken, the Court's ruling is modified and further proceedings required in any of these cases, it is advisable in the interests of a prompt ultimate determination for the Court to indicate briefly its views on these subsidiary questions.

 There permeates the entire controversy a dispute as to whether the Secretary at one stage or another violated his trust responsibility to the Alaskan Natives. In the context of this statute, the Court finds that the Secretary was obliged, in a broad sense, to act in the nature of a trustee, which required him, at the least, not to disadvantage the Natives without good cause. This does not resolve the question, however. It must be recognized that under the statute and regulations the Secretary occupied a position as a quasi-judicial officer, and whatever

trust responsibility he may have had did not extend so far as to require him to abandon his role as a neutral, impartial and disinterested decision maker. Clearly Congress did not intend for all issues to be decided in favor of the Natives regardless of the underlying situation. This is particularly true where the interest competing with the Natives' was that of the public, to whom the Secretary as a governmental servant also had a solemn responsibility. In any event, whatever benefits are not awarded to one group of Natives inure under the statute to another group, so that the Secretary's trust obligation was in equipoise and did not require that, in effect, he favor some Natives over others. Under all the circumstances, no breach of trust was shown.

 Another important issue is whether or not in village eligibility hearings residence is determined conclusively by the roll prepared by the Secretary pursuant to 43 U.S.C. § 1604 (Supp. III, 1973). The Board and the Secretary took the position that this was not the case, and it appears to the Court that their view is correct. Sections 1610(b)(2)(A), (b)(3)(A) of 43 U.S.C. (Supp. III, 1973), do not refer to the roll at all, but rather provide that this residence determination be based on "the census or other evidence satisfactory to the Secretary." *See also* § 1602 (c). Moreover, these same sections state that the Secretary "shall make findings of fact in each instance," a requirement which would be unnecessary if the roll were dispositive. These specific and unambiguous sections must control over the more general language of 43 U.S.C. § 1604. Thus a re-examination of residence is permissible where the eligibility of a village is properly in issue. This, however, is a two-way street and once the matter is opened up the Secretary or his delegate cannot set aside the residence determination in the roll and decrease the number of village residents without also adjusting the figures to add additional residents who

were incorrectly excluded. Since the Secretary did refuse to consider increasing the number of residents in the case of Pauloff Harbor, his decision in this regard was erroneous.

Another issue of some moment involves the three listed villages of Uyak, Salamatof and Pauloff Harbor. These villages are presumptively eligible under the statute. However, the Secretary by regulation added eligibility requirements beyond those specified in the Act, see 43 C.F.R. § 2651.2(b) (discussed *supra*). No challenge to this is raised by the unlisted villages, which must be "established" villages to qualify for benefits, 43 U.S.C. § 1610(b)(3) (A) (Supp. III, 1973). As to the listed villages, the question is presented whether these regulations are consistent with the Act and within the rule-making power conferred upon the Secretary by 43 U.S.C. § 1624 (Supp. III, 1973). The Court holds that the statutory standards for listed villages are exclusive, and thus these regulations were beyond the authority of the Secretary.

The contention that the Secretary did not act within the statutory deadlines is without merit. It was not the purpose of the statute to prevent orderly quasi-judicial determination of issues which properly had been raised prior to the deadline date.

The Court does not consider the claim that individual Natives should have been made parties to the administrative proceedings. These Natives are not before the Court and the villages are without standing to raise the point. Indeed, recognizing these defects, counsel withdrew this claim at oral argument.

Plaintiffs' motions for summary judgment are therefore granted, and defendant's cross-motions are denied. An appropriate Order is attached.

### ORDER

For the reasons stated in the accompanying Memorandum which sets forth the Court's findings of fact and conclusions of law, the motions for summary judgment of each and all of the plaintiffs should be, and hereby are, granted, and the defendant's cross-motions for summary judgment are denied. Accordingly, in each instance the final decision of the Area Director, Juneau Area Office of the Bureau of Indian Affairs, shall be reinstated and shall constitute the final determination as to village eligibility under the Alaska Native Claim Settlement Act, 43 U.S.C. § 1601 *et seq.* (Supp. III, 1973).

So ordered.