580 F.2d 601
 188 U.S.App.D.C. 338
 KONIAG, INC., the VILLAGE OF UYAK
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF LITNIK KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
SALAMATOF VILLAGE ASSOCIATION and Cook Inlet Region, Inc.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF ANTON LARSEN BAY KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF UGANIK KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF BELLS FLATS KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF AYAKULIK KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF PORT WILLIAM KONIAG, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
The VILLAGE OF SOLOMON BERING STRAITS NATIVE CORPORATION
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
VILLAGE OF ALEXANDER CREEK COOK INLET REGION, INC.
v.
Cecil D. ANDRUS, Secretary of the Interior, Appellant.
 Nos. 76-1325 to 76-1334.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 24, 1977.
Decided April 28, 1978.
 
 Appeals from the United States District Court for the District of columbia.
 Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Edmund B. Clark, Raymond N. Zagone and Herbert Pittle, Attys., Dept. of Justice, Washington, D. C., were on brief, for appellant.
 Edward Weinberg and F. Conger Fawcett, Washington, D. C., with whom Frederick L. Miller, Jr. and John P. Meade, Washington, D. C., were on brief, for appellees.
 Avrum M. Gross, Atty. Gen., State of Alaska, Juneau, Alaska, filed a brief on behalf of the State of Alaska as amicus curiae urging reversal.
 Before WRIGHT, Chief Judge, BAZELON and ROBB, Circuit Judges.
 Opinion for the Court filed by ROBB, Circuit Judge.
 ROBB, Circuit Judge:
 
 
 1
 The plaintiffs, eleven Native Alaskan villages, filed this action to challenge decisions of the Secretary of Interior which found each of them ineligible to take land and revenues under the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 Et seq.
 
 
 2
 The Alaska area director of the Bureau of Indian Affairs (BIA) had determined initially that all eleven villages were eligible under ANCSA but on administrative appeal the Secretary of the Interior ruled to the contrary. Granting summary judgment to the villages[1] the District Court vacated the Secretary's determinations and ordered the BIA decisions reinstated. Koniag, Inc. v. Kleppe, 405 F.Supp. 1360 (D.D.C.1975). The District Court did so in four of the cases on the ground that the BIA decisions had been appealed to the Secretary by a party without standing to do so; the appeals were therefore unauthorized and invalid, and under Department of the Interior regulations, the BIA decision, if unappealed, constituted the final decision of the Secretary. In the other seven cases, the court held the procedure followed to determine the appeals failed to comply with due process and further, that congressional interference had infected the determinations. The court ordered the BIA decisions reinstated in these seven cases because the effects of the congressional interference lingered and the BIA decisions were the last untainted decisions of the Secretary's delegate.
 
 
 3
 On appeal the Secretary attacks each of the District Court's rulings on the merits and argues that the proper remedy under any circumstances is a remand to him rather than reinstatement of the BIA decisions. We conclude that the District Court erred on the standing and congressional interference issues. We agree with the District Court, however, that the appeal procedure used here does not meet the requirements of due process. Accordingly, we hold that the proper remedy is a remand to the Secretary to redetermine these cases.
 
 THE ACT AND THE REGULATIONS
 
 4
 Claims of Native Alaskans have long created obstacles to development of Alaska's oil and other natural resources and have raised questions of the state's ability to take dominion over public lands that it might otherwise select under provisions of the Alaska Statehood Act. To deal with this problem Congress intended ANCSA to accomplish a fair, rapid settlement of all aboriginal land claims by Natives and Native groups without litigation. The District Court's opinion contains an excellent summary of ANCSA, 405 F.Supp. 1364-67; for our purposes here, however, the complexities of the Act can be simplified. Under ANCSA, 40 million acres of land and $962,000,000 are to be distributed to Native villages and regional corporations; in exchange, all aboriginal titles and claims are to be extinguished. The funds and lands made available through the Act are to be divided among 13 regional corporations, in which the Natives hold stock, and whatever villages are found to be eligible. Depending upon their population, eligible villages may select between 69,120 and 161,280 acres from the public lands in their vicinity. The village will receive a patent to the surface estate and the regional corporation will receive a patent to the subsurface estate. Village eligibility requirements are set forth in the Act. 43 U.S.C. § 1610(b)(2), (3). The Secretary of the Interior is charged with making village eligibility determinations and with implementing the Act.
 
 
 5
 The Secretary adopted regulations to govern the decision-making process. 43 C.F.R. Part 2650 (1973). These regulations were applied in deciding the cases of the eleven villages. The Alaska area director of the BIA made initial eligibility determinations on all applicant Native villages. He published his proposed decision in the Federal Register and it became the final decision of the Secretary unless protested by "any interested party" within thirty days. Upon receipt of a protest, the area director evaluated it and rendered his final decision within thirty days. This decision, in turn was appealed to the Secretary by an "aggrieved party" filing notice with the Alaska Native Claims Appeal Board.[2] 43 C.F.R. § 2651.2 (1973); Id. § 4.700 (1973). Although the regulations did not require a particular type of hearing on appeals, the Board referred all appeals to a Department of the Interior Administrative Law Judge (ALJ) who conducted a full De novo hearing on the record. The parties were permitted to submit proposed findings and conclusions to the ALJ.
 
 
 6
 At this point the procedure veered from the usual course of administrative law. The recommended decision of the ALJ was forwarded to the Board without being served on the villages concerned. The Board made formal decisions based on the hearing record in each case and forwarded its recommended decisions to the Secretary, also without service on the villages. Only after the Secretary personally decided to accept the Board's decisions were the recommended decisions of the ALJ and the Board revealed to the parties.
 
 STANDING
 
 7
 The first issue we must resolve is whether appeals from the BIA decisions were properly taken. The BIA area director determined that all ten of the villages before us here, See note 1 Supra, were eligible under ANCSA. The U.S. Fish and Wildlife Service, the Forest Service, and the State of Alaska appealed one or another of the decisions, arguing that the villages did not meet the requirements of the Act. After separate De novo proceedings before an ALJ and review as described above, the Secretary ruled that the villages were not eligible under the Act.
 
 
 8
 In the District Court the villages renewed the argument which they had pressed before the ALJ that neither the federal agencies nor the State had standing to appeal from the BIA decisions. The District Court rejected the argument with respect to six of the villages because of the possibility that they might select land from a Wildlife Refuge or National Forest. The court noted:
 
 
 9
 some presently immeasurable degree of disadvantage may result if an unqualified village obtains authority over a portion of the lands now in the exclusive care of the United States and that this is sufficient to provide standing. . . . Moreover, the Forest Service and the Fish and Wildlife Service have broad mandates to protect our forests and wildlife, E. g., 16 U.S.C. §§ 551, 553; 16 U.S.C. § 742a Et seq. The Court is particularly reluctant to deny standing to those most likely in fact to have a legitimate concern about these lands and to come forward to protect the public interest, especially where the effect of finding standing is simply to allow adversary proceedings to be held which, if properly conducted, could contribute to fair and informed decision making.
 
 
 10
 405 F.Supp. at 1368-69.
 
 
 11
 We agree with the District Court's reasoning here and adopt it.[3] However the District Court went on to hold that the appeals from the BIA decisions in four other cases were invalid because as to two, Anton Larsen Bay and Bells Flats, the federal agencies had no standing to take the appeals, and as to two others, Alexander Creek and Solomon, the State of Alaska had no standing.
 
 The Federal Agencies
 
 12
 The District Court ruled against the standing of the agencies to appeal the cases of Anton Larsen Bay and Bells Flats because
 
 
 13
 (e)ach of these two villages had made extensive good-faith commitments not to take land from a wildlife refuge or national forest. Even the most theoretical harm was removed by these commitments . . .
 
 
 14
 405 F.Supp. at 1369.
 
 
 15
 The issue is whether the Secretary has violated his regulations in permitting the Fish and Wildlife Service and the Forest Service to appeal administratively the decision on the eligibility of the two villages. Under the regulations, "any interested party" may protest the BIA initial decision, 43 C.F.R. § 2651.2(a)(3) (1973), and "any party aggrieved" by the BIA final decision may appeal to the Board. 43 C.F.R. § 4.700 (1973). The villages concede that these agencies were "interested parties" for purposes of protest but argue that they were not "parties aggrieved" to appeal. Citing Office of Communication of The United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 334, 359 F.2d 994, 1000 (1966) and National Welfare Rights Organization v. Finch, 139 U.S.App.D.C. 46, 53 n.27, 429 F.2d 725, 732 n.27 (1970) for the proposition that "the concept of standing at the administrative level and in the courts is essentially interchangeable," brief at 15, the villages argue that the agencies are not "parties aggrieved" because they have not demonstrated the kind of concrete injury necessary for standing to obtain judicial review. Neither case stands for so broad a proposition.
 
 
 16
 In the Church of Christ case the court assumed that the same standards apply to determining standing before an agency and standing to obtain judicial review and went on to hold that the FCC must permit listeners to participate in broadcast relicensing proceedings. In the National Welfare Rights Organization case the court reasoned that a party with an interest sufficient to obtain judicial review of agency action should be permitted to participate before the agency to ensure it meaningful judicial review on all the issues. But it does not follow from either case that a party must be Excluded from participation before the agency if it does not have a sufficient interest to meet Article III requirements for judicial review. Indeed, as we pointed out in the National Welfare Rights Organization case, "standing to sue depend(s) on more restrictive criteria than standing to appear before administrative agencies . . ." 139 U.S.App.D.C. at 53 n.27, 429 F.2d at 732 n.27; See Gardner v. FCC, 174 U.S.App.D.C. 234, 238, 530 F.2d 1086, 1090 (1976). See also 3 K. Davis, Administrative Law Treatise § 22.08, at 240 (1958). To determine what a party must show to qualify as aggrieved under the regulations, we look to the scheme intended and devised by the Congress and the Secretary. See Office of Communication of the United Church of Christ v. FCC, supra, 123 U.S.App.D.C. at 334-36, 359 F.2d at 1000-02.
 
 
 17
 Congress sought to quiet the Native land claims in Alaska justly and expeditiously, so that the State's development could proceed. At the same time Congress took care to assure that grants of public lands would be made only to eligible Native groups by requiring the Secretary to review the eligibility of each village. Over two hundred villages were involved. Although many findings could be perfunctory because eligibility was clear, the eligibility of some villages was in dispute. It is apparent that the Secretary intended the area director of the BIA to settle the easy, undisputed cases, but when a party was adversely affected by the area director's determination, the Secretary would make his own eligibility determination after more elaborate factfinding in the three-tiered appeal process. A necessary corollary to this scheme is that the term "party aggrieved" must be construed generously to achieve the congressional objective that determinations be careful as well as quick. We conclude, therefore, that grafting strict judicial standing requirements onto these regulations would be inconsistent with the Act and the Secretary's plan to implement it.
 
 
 18
 Both the ALJ and the Board determined that the Forest Service and the Fish and Wildlife Service were parties aggrieved within the meaning of 43 C.F.R. § 4.700 (1973). Because he approved the Board's decisions the Secretary is presumed to have concurred. This interpretation of the regulation is entitled to great deference. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 19
 The District Court found it determinative that the two villages "had made extensive good-faith commitments not to take land from a wildlife refuge or a national forest". 405 F.Supp. at 1369. However, the ALJ and the Board had held that this did not vitiate the standing of the agencies to appeal. We agree. These villages are located on Kodiak and Afognak Islands, large parts of which are included in Chugach National Forest and Kodiak National Wildlife Refuge. Available public land is thus limited and numerous villages appear to be eligible to select from it. If the two villages make all their selections from the limited unrestricted acreage, other villages may be compelled to choose land within the refuge or forest. The adverse effect on the Forest Service or the Fish and Wildlife Service would be plain. Ample testimony in the records of these two cases, credited by the ALJ, supports the likelihood of this occurring. Bells Flats ALJ Recommended Decision at 9-10; Anton Larsen Bay ALJ Recommended Decision at 9-10. At best, therefore, the commitments of the two villages not to select forest or refuge land attenuate the likelihood of harm to these agencies, but they do not negate it. We cannot say that the rationale of the ALJ, or of the Board in adopting it, amounts to a "plainly erroneous" interpretation of the term "party aggrieved" as it is used in the regulations. Udall v. Tallman, supra 380 U.S. at 17, 85 S.Ct. 792. Thus we must sustain that interpretation and reverse the District Court's holding that the appeals from the BIA decision on Anton Larsen Bay and Bells Flats were invalid.
 
 The State of Alaska
 
 20
 Alaska was the only party to appeal the decision on the eligibility of Solomon and Alexander Creek.[4] The District Court held that Alaska had no standing to do so because "(t)he State's only interest was the speculative possibility that at some later time for some undisclosed reason it might, under the Alaska Statehood Act, seek to have land patented to it that would be claimed by these villages." 405 F.Supp. at 1369. We think this possibility is enough to confer standing upon Alaska under the regulations.
 
 
 21
 The Alaska Statehood Act, 72 Stat. 339 (1958), gives Alaska until 1984 to select more than 103 million acres from federal lands in the state not already reserved for another purpose. Id. § 6(a), (b), 72 Stat. 340. Putting aside minor exceptions not relevant here, ANCSA reserves 25 townships immediately surrounding a Native village from which the village must select its lands. The regional corporations may fill their land entitlements only with land surrounding a village, and the land patented to the villages and regional corporations cannot be selected by the State. Thus it is in the interest of the regional corporations to establish the existence of eligible villages on valuable mineral-bearing lands, and it is in the interest of the State to prove that such villages are ineligible.
 
 
 22
 The District Court was persuaded that Congress already accounted for the State's interests in the Act when it
 
 
 23
 excluded from the definition of "public lands" that could be taken by the villages any "land selections of the State of Alaska which have been patented or tentatively approved under section 6(g) of the Alaska Statehood Act, as amended (72 Stat. 341, 77 Stat. 223), or identified for selection by the State prior to January 17, 1969," 43 U.S.C. § 1602(e) (Supp. III, 1973). The failure of the State to bring itself within this statutory provision underscores the conjectural and attenuated nature of its interest here. Alaska had ample opportunity to select land but did not do so, and one does not have standing merely by appearing in a case for the purpose of keeping one's options open an indefinite period in the future.
 
 
 24
 405 F.Supp. at 1369.
 
 
 25
 The provision cited by the District Court protects lands in which Alaska already had expressed interest; but we do not infer from it a congressional intention to negate any interest Alaska might have elsewhere. At the time of statehood, and even now, the value of much of the land was not and has not been established. We think Alaska has been reasonable in exercising its right under the Statehood Act to wait until 1984 to complete its land selections.[5] As in the case of the federal agencies, our inquiry is limited to determining whether the Secretary has violated his regulations in permitting Alaska to take these appeals as a party aggrieved.
 
 
 26
 The regulations provide that the BIA decisions are to be served on the village affected, all villages within the region, all regional corporations and the State of Alaska. 43 C.F.R. § 2651.2(a)(2), (4), (8). We interpret this requirement as evidence that the Secretary regarded these parties as potentially aggrieved if a village were wrongfully determined to be eligible or ineligible. We agree with the District Court that the interest of Alaska in these two cases is conjectural at best but we emphasize we are not dealing with Article III considerations here; rather, the inquiry is whether the Secretary has violated his own regulations. In light of the broad reading which the Secretary has given the term "party aggrieved" we cannot say that permitting Alaska to appeal in the cases of Solomon and Alexander Creek was a plainly erroneous interpretation of the regulations.
 
 
 27
 We hold therefore that all ten of the administrative appeals taken in these cases were valid and we turn to the question whether the procedure followed comported with principles of due process.
 
 THE ADMINISTRATIVE APPEAL PROCEDURE
 
 28
 The District Court held that the administrative process used here was improper because the
 
 
 29
 Secretary, who reserved final decision to himself, was prevented from making a rational decision on the records developed because the decisions of both the administrative law judges and the Ad Hoc Board were kept In camera and remained undisclosed to the parties until the Secretary had already reached his final decision. This process denied the villages the opportunity to bring to the Secretary's attention any exceptions or objections they might have had to the determinations below. 5
 
 
 30
 405 F.Supp. at 1370 (footnote omitted).
 
 
 31
 The Secretary argues that the administrative decisionmaking was institutional. Relying upon the Morgan cases[6] the Secretary asserts that he was not required to circulate to the parties "recommended decisions prepared by subordinates for approval by the Secretary." Under this analysis the ALJ and the Board are mere assistants who aided the Secretary in making his decision by tendering recommendations in the nature of draft decisions. The institutional process used here, in the Secretary's view, met whatever due process requirements there were by affording all parties an opportunity to present their cases and confront their opponents before the ALJ.[7] We do not agree.
 
 
 32
 At the outset we affirm the District Court's holdings that the villages have a sufficient property interest to come within the due process clause. 405 F.Supp. at 1370. Indeed the Secretary concedes as much. The issue is what process is due under the circumstances. The Secretary argues that the opportunity to present a case and to confront opponents before the ALJ was enough. The difficulty with this position is that it overlooks the mandate of Congress in ANCSA which declares that "the settlement should be accomplished . . . with maximum participation by Natives in decisions affecting their rights and property." 43 U.S.C. § 1601(b). We are unable to reconcile the Secretary's "institutional" approach with so clear an expression of Congress' will.
 
 
 33
 The only conceivable purpose of the secret review procedure was to expedite the resolution of the claims. This is a valid purpose, responsive to Congress' instruction that the settlement be accomplished rapidly; nevertheless, affording the villages an opportunity to see the recommended decisions and to brief exceptions to them would cause only a slight delay in the proceedings. At the same time that opportunity would greatly enhance the participation of the Natives as well as the appearance of fairness so critical to the administrative process.
 
 
 34
 Determinations of village eligibility need not comply with the Administrative Procedure Act (APA) requirements for adjudications because ANCSA does not require that they be made "on the record after an opportunity for an agency hearing." 5 U.S.C. § 554(a); See 43 U.S.C. § 1610(b)(2), (3). Nonetheless, we are guided by its requirements in a case such as this which entails due process rights but has no controlling statutory procedures. See Wong Yang Sung v. McGrath, 339 U.S. 33, 50-51, 70 S.Ct. 445, 94 L.Ed. 616 (1950); Riss & Co. v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345 (1951), Rev'g per curiam, 96 F.Supp. 452 (W.D.Mo.1950) (3 judge court). Section 557(c) of the APA provides that parties be given an opportunity to submit proposed findings and conclusions, or exceptions to decisions before a recommended, initial, or tentative decision of an agency is reviewed within the agency. In these cases there were two intermediate decisions in the administrative review process, the ALJs' initial decisions and the Board's recommended decisions. The villages had an opportunity to submit, and did submit, proposed findings and conclusions to the ALJs before the initial decisions were made. The villages were not, however, permitted to see the ALJs' decisions nor were they permitted to submit exceptions before the Board made its recommended decisions. We believe that ANCSA's requirement of maximum participation by the Natives required the Secretary to extend the full measure of procedural rights suggested by section 557(c). Considering the great importance to the Natives of these potential property rights (the Quid pro quo for the extinguishment of their aboriginal titles), the congressional requirement of maximum participation by the Natives, and the minimal cost to administrative expediency, See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), we hold that on remand the Secretary must permit the parties to take exceptions to the ALJs' decisions[8] and to submit briefs thereon to the Board.
 
 
 35
 The Supreme Court's recent decision in Vermont Yankee Nuclear Power Corp. v. NRDC, --- U.S. ----, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) does not require a different result. In that case, the Court held that a reviewing court may not dictate to an agency the methods and procedures to be followed to develop an adequate record for judicial review.
 
 
 36
 Absent constitutional constraints or extremely compelling circumstances "the administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.' " Federal Communications Comm'n v. Schreiber, 381 U.S. 279, 290, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965), quoting from Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 84 L.Ed. 656 (1940).
 
 
 37
 --- U.S. at ----, 98 S.Ct. at 1211. Our holding today does not trench upon this principle. We hold only that the Secretary's secret review process is inconsistent with both constitutional constraints and the mandate of ANCSA that Natives participate as fully as possible in the decisionmaking.
 
 THE REMEDY
 
 38
 The District Court ordered the decisions of the BIA area director reinstated because hearings conducted by Congressman Dingell "constituted an impermissible congressional interference with the administrative process", 405 F.Supp. at 1372, which destroyed the appearance of administrative impartiality and caused actual prejudice to the villages, denying them fundamental fairness required by the Fifth Amendment. See Pillsbury Co. v. FTC, 354 F.2d 952 (5th Cir. 1966). The court believed that the effects of the interference lingered making the usual remedy, remand to the Secretary for a redetermination, impossible. We disagree.
 
 
 39
 The hearings in question were called by Congressman Dingell in June of 1974 at the time the Board and the Secretary were considering most of these cases. Alaska Native Claims, Hearings Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the Comm. on Merchant Marine and Fisheries, 93d Cong., 2d Sess. (1975). During the hearings Congressman Dingell made no secret of his displeasure with some of the initial BIA eligibility determinations. Nevertheless, we think the Pillsbury decision is not controlling here because none of the persons called before the subcommittee was a decisionmaker in these cases. One possible exception was Mr. Ken Brown, a close advisor to the Secretary who briefed him on the cases at the time he decided to approve the Board's recommended decisions. However, even if we assume that the Pillsbury doctrine would reach advisors to the decisionmaker, Mr. Brown was not asked to prejudge any of the claims by characterizing their validity. See Pillsbury Co. v. FTC, supra at 964. The worst cast that can be put upon the hearings is that Brown was present when the subcommittee expressed its belief that certain villages had made fraudulent claims and that the BIA decisions were in error. This is not enough.
 
 
 40
 A more serious matter is a letter that Congressman Dingell sent to the Secretary two days before he determined that eight of these villages were ineligible. The letter requested the Secretary to postpone his decisions on the cases pending a review and opinion by the Comptroller General, because it "appears from the testimony (at the hearings) that village eligibility and Native enrollment requirements of ANCSA have been misinterpreted in the regulations and that certain villages should not have been certified as eligible for land selections under ANCSA." The letter did not specify any particular villages, but we think it compromised the appearance of the Secretary's impartiality.[9] D.C. Federation of Civic Ass'ns v. Volpe, 148 U.S.App.D.C. 207, 222, 459 F.2d 1231, 1246, Cert. denied, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); See Pillsbury Co. v. FTC, supra at 964. Nevertheless, a remand to the Secretary, rather than a reinstatement of the BIA decisions, is the proper remedy in this case. Assuming the worst that the letter contributed to the Secretary's decision in these cases we cannot say that 31/2 years later, a new Secretary in a new administration is thereby rendered incapable of giving these cases a fair and dispassionate treatment.
 
 RESIDENCE DETERMINATION
 
 41
 One final matter remains to be considered. The villages challenge the District Court's conclusion that because the residence of Natives is not established conclusively by the roll prepared by the Secretary pursuant to 43 U.S.C. § 1604 residence was open to redetermination in the village eligibility proceedings. The Secretary argues that this challenge is barred because no cross-appeal was filed. We reject this argument, See note 3 Supra, but affirm the District Court's interpretation of the statute for the reasons stated in its opinion.[10] 405 F.Supp. 1373-74.
 
 CONCLUSION
 
 42
 We hold the administrative appeals by the Fish and Wildlife Service, the Forest Service, and the State of Alaska were valid. The appeal process itself, however, should have permitted the parties to take exceptions to the ALJs' recommended decisions and to submit briefs to the Board for its consideration. Therefore, these cases must be remanded to the District Court for remand to the Secretary for redetermination of the appeals. The judgment of the District Court is
 
 
 43
 Affirmed in part, reversed in part.
 
 BAZELON, Circuit Judge, concurring:
 
 44
 I join Judge Robb's fine opinion for the court, but wish to highlight my reasons for concluding that appellants had standing to seek administrative review of the village eligibility decisions.
 
 
 45
 The decisions of this court and others on administrative standing have created not a little uncertainty.[1] It is unclear whether the limitations appurtenant to judicial standing apply in the administrative context. And if such limitations do not apply, it is unclear what standards should govern. For the reasons set forth below, I find no basis for importing judicial standing doctrines into the administrative area. In my view, administrative standing should be determined in light of the functions of an administrative agency, and whether a would-be participant would contribute to fulfilling those functions.
 
 I.
 
 46
 An examination of the theoretical foundations of judicial standing reveals no reason to equate judicial and administrative standing. The Supreme Court has identified two general types of judicial standing limitations constitutional limitations derived from the "case or controversy" requirement of Article III, and prudential limitations formulated by the Court in its supervisory capacity over the federal judiciary. See generally, Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37-46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Neither type of limitation is applicable in the administrative context.
 
 
 47
 The "case or controversy" requirement of Article III restricts federal courts to adjudication of disputes in which a plaintiff has a "personal stake" in the outcome. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). This means, first and most fundamentally, that a plaintiff must allege "some threatened or actual injury resulting from the putatively illegal action . . . ." Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). In addition, the Supreme Court has ruled that a plaintiff must assert an injury that is likely to be "redressed by a favorable decision," Eastern Kentucky, supra 426 U.S. at 38, 96 S.Ct. 1917, and an injury that can fairly "be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Id.
 
 
 48
 Administrative agencies, like federal courts, frequently exercise adjudicatory or "quasi-judicial" functions. But administrative tribunals have few if any of the indicia of the "inferior courts" Congress is authorized to establish pursuant to Article III.[2] Even independent regulatory agencies do not share the two attributes of federal courts explicitly mentioned by the Constitution secure compensation and life tenure. Hence, administrative agencies are not bound by the "case or controversy" limitation of Article III.[3] Congress, in its discretion, can require that any person be admitted to administrative proceedings, whether or not that person has alleged "injury in fact" or has satisfied the other constitutional standing requirements recognized by the Supreme Court.
 
 
 49
 Prudential rules of judicial standing, like Article III limitations, are "founded in concern about the proper and properly limited role of courts in a democratic society." Warth, supra 422 U.S. at 498, 95 S.Ct. at 2205. The major prudential limitations recognized by the Supreme Court are the requirement that the plaintiff assert an interest " 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises," Eastern Kentucky, supra 426 U.S. at 39, n.19, 96 S.Ct. at 1925; that the plaintiff assert more than "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," Warth, supra 422 U.S. at 499, 95 S.Ct. at 2205; and that the plaintiff assert his own rights and interests, rather than those of third parties. Id.
 
 
 50
 The function of prudential standing rules, the Court has stressed, is to "limit the role of courts in resolving public disputes." Warth, supra at 498, 95 S.Ct. at 2206; Id. at 500, 95 S.Ct. 2197. Prudential limitations serve to define "the proper judicial role relative to the other major governmental institutions in the society." Tax Analysts and Advocates v. Blumenthal, 566 F.2d 130, 139 (D.C.Cir. 1977). In short, prudential limitations reflect a concern about the limited authority and competence of the judiciary in setting general policy.
 
 
 51
 As such, prudential limitations are no more applicable to administrative agencies than Article III limitations. The authority of federal courts to set general policy is restricted by Article III, which empowers courts to hear only "cases" and "controversies." Administrative agencies, on the other hand, derive their powers from Congress, and thus indirectly from Article I. Although this delegation of power is subject to limitations,[4] an agency has unquestioned authority to set general policies affecting large numbers of people when it acts within the scope of its statutory mandate.
 
 
 52
 The competence of federal courts to formulate general policy is also severely limited by the method in which they reach decisions. Courts are confined to the resolution of particular disputes in an adversary setting. Administrative agencies, however, have unique resources for establishing broad, prospective policies. Unlike courts, administrative agencies can devote uninterrupted attention to relatively narrow problem areas, and can call upon technical staff assistance in formulating solutions. Unlike courts, they are not limited to the adjudicatory format, but have the flexibility to proceed by adjudication, legislative hearings, rulemaking, investigation or in other ways. And unlike courts, agencies do not have to wait for a plaintiff to file suit; they have the power to institute an investigation or an action on their own initiative.
 
 
 53
 The decisions of this circuit, as appellants acknowledge, are "not uniform" on the subject of whether judicial standing principles should be applied in administrative proceedings. App. Br. at 14 n.4. Admittedly, a number of decisions, including one by the author of this opinion, have applied judicial standing concepts in determining whether a party should have standing before an agency.[5] At the same time, however, nearly all courts have have considered the question have recognized at least a theoretical distinction between judicial and administrative standing.[6] Moreover, most decisions that apply judicial standing concepts stand only for the proposition that if a party would have standing to seek judicial review of administrative action, he should be allowed to appear before the agency, if only to assure the proper development of the record. See, e. g., National Welfare Rights Organization v. Finch, 139 U.S.App.D.C. 46, 57-58, 429 F.2d 725, 736-37 (1970).[7] As such, these cases do not establish that administrative standing would necessarily be improper if a party would Not have standing to obtain judicial review.
 
 
 54
 The fact that judicial and administrative standing are conceptually distinct does not, of course, mean that Congress could not require an administrative agency to apply judicial standing concepts in determining administrative standing. Nor does it mean that courts and agencies should never refer to judicial standing decisions, where helpful, by way of analogy. But absent a specific justification for invoking judicial standing decisions, I see no basis for interjecting the complex and restrictive law of judicial standing into the administrative process.
 
 II.
 
 55
 What Should be the standards for determining standing to appear before an agency? Generalizations are hazardous, for administrative standing questions arise in contexts as diverse as the methods and objectives of the agencies themselves. Nevertheless, the present case suggests some principles that may be broadly applicable.
 
 
 56
 The starting point in determining administrative standing should be the language of the statutes and regulations that provide for an administrative hearing, appeal or intervention. To be sure, these sources frequently provide no criteria for determining standing, or speak in vague terms of persons "aggrieved," "affected," or having an "interest" in which case they are of little assistance. On occasion, however, the applicable statutes and regulations do supply specific criteria for determining standing, in which case they should of course be controlling.
 
 
 57
 An example of a regulation supplying relatively precise standards is 43 C.F.R. § 4.902 (1976), part of the new regulations on ANCSA hearing procedures promulgated after the hearings in the instant cases were completed.[8] This section provides:
 
 
 58
 Any party who claims a property interest in land affected by a determination from which an appeal to the Alaska Native Claims Appeal Board is allowed, or an agency of the Federal Government, may appeal as provided in this subpart. However, a regional corporation shall have the right of appeal in any case involving land selections.
 
 
 59
 This regulation quite clearly establishes three classes of persons who have standing: those asserting a property interest in land, federal agencies, and regional corporations in land selection cases. It thus provides fairly objective criteria that can be applied without recourse to a more refined analysis.[9]
 
 
 60
 More often, however, the statutes and regulations do not provide specific guidelines for determining administrative standing. The regulation actually applied in these cases, for example, refers only to "(a)ny party aggrieved. . . . " 43 C.F.R. § 4.700 (1976).[10] Such a general and indefinite provision suggests no concrete standards for determining who should have standing to appeal. In these circumstances, I believe a functional analysis of administrative standing is appropriate. Such an analysis would examine the nature of the asserted interest, the relationship of his interest to the functions of the agency, and whether an award of standing would contribute to the attainment of these functions.
 
 
 61
 There is nothing revolutionary about such an approach to administrative standing. Several commentators have suggested adoption of a functional standard.[11] Moreover, the elements of a functional approach can be discerned in our prior decisions most prominently, in fact, in the very cases cited by appellees for the proposition that judicial standing limitations should govern.
 
 
 62
 The seminal decision on administrative standing pointing toward a functional approach is Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). We held there that standing to intervene in a Federal Communications Commission license renewal proceeding is not limited to those alleging economic injury or electrical interference, but extends also to responsible representatives of the listening public. We ruled that "the concept of standing is a practical and functional one designed to insure that only those with a genuine and legitimate interest can participate in a proceeding." Id. 123 U.S.App.D.C. at 336, 359 F.2d at 1002. Given this standard, we could "see no reason to exclude those with such an obvious and acute concern as the listening audience." Id. Moreover, we found that the Commission had insufficient resources to fulfill its obligation to assure balanced broadcast programming. Representatives of the listening public, acting as "private attorneys general" enforcing the Commission's Fairness Doctrine, would therefore provide valuable assistance. Id. 123 U.S.App.D.C. at 337-38, 359 F.2d at 1003-04. We specifically rejected the Commission's argument that a broad rule of standing would overwhelm the Commission with "hosts" of protestors, and found that the Commission had authority to adopt rules to screen out spurious petitions and "limit public intervention to spokesmen who can be helpful." Id. 123 U.S.App.D.C. at 339, 359 F.2d at 1005.
 
 
 63
 In National Welfare Rights Organization v. Finch, 139 U.S.App.D.C. 46, 429 F.2d 725 (1970), we expanded the rationale of United Church of Christ, making the functional elements of the analysis even more explicit. We held that organizations of welfare recipients were entitled to take part in hearings conducted by the Department of Health, Education and Welfare to determine if state welfare programs were in conformance with federal standards. A functional-type analysis of the organizations' standing served as an alternative ground for the decision:
 
 
 64
 As intervenors in conformity hearings appellants may serve the public interest in the maintenance of an efficient state-federal cooperative welfare system. Appellants' role would be analogous to that of persons accorded standing, not for the protection of their own private interests, but because they are especially well suited to represent an element of the public interest. Thus they serve as "private attorneys general."
 
 
 65
 Id. 139 U.S.App.D.C. at 59, 429 F.2d at 738. As in United Church of Christ, supra, we noted that the "threat of hundreds of intervenors" was more apparent than real. The appropriate way to limit the possibility of abuse was "by controlling the proceeding so that all participants are required to adhere to the issues and to refrain from introducing cumulative or irrelevant evidence," not by "excluding parties who have a right to participate." Id., quoting Virginia Petroleum Jobbers Ass'n v. FPC, 105 U.S.App.D.C. 172, 265 F.2d 364 n.1 (1959).[12]
 
 
 66
 These authorities suggest a functional analysis composed of the following factors:
 
 
 67
 (1) The nature of the interest asserted by the potential participant.
 
 
 68
 (2) The relevance of this interest to the goals and purposes of the agency.
 
 
 69
 (3) The qualifications of the potential participant to represent this interest.
 
 
 70
 (4) Whether other persons could be expected to represent adequately this interest.
 
 
 71
 (5) Whether special considerations indicate that an award of standing would not be in the public interest.
 
 
 72
 Such a standard would have to be flexible, of course, and the appropriate variables might well vary from one context to another.[13] The important point is that administrative standing should be tailored to the functions of the agency, not to arcane doctrine from another area of the law.
 
 
 73
 Under such an approach, there can be little doubt that the Secretary acted properly in finding that the United States Fish and Wildlife Service, the National Forest Service, and the State of Alaska had standing to appeal the eligibility determinations of the BIA area director. In fact, although the standing discussion of the Alaska Native Claims Appeals Board, acting for the Secretary, relied in part on a consideration of judicial standing concepts, it also included an elementary functional analysis.
 
 
 74
 The federal agencies and the State of Alaska maintained that if certain villages were eligible to take public lands, their own flexibility in selecting such lands would be impaired. The Board found that this interest established "a nexus with the village sufficient to assure the presentation of factual evidence relevant to the village's eligibility." State of Alaska v. Village of Solomon, Final Decision of Board and Secretary (Sept. 16, 1974) at 4. Thus, the Board found that the asserted interest was relevant to one of the principal purposes of the Act determination of eligibility "with the fullest possible command of the relevant facts." Id. the board concluded that it was proper to recognize appellants' standing, "particularly when the Secretary's factfinding obligation would be thwarted by a more restrictive approach." Id. No suggestion was made by the Board that appellants were not qualified to represent the interest they asserted, that affording them an appeal would result in duplicative presentations, or that there were any considerations of public policy militating against recognizing their standing.[14]
 
 
 75
 Under these circumstances, the Board was amply justified in finding that appellants had standing. Further analysis of standing concepts, judicial or otherwise, was unwarranted and unnecessary.
 
 
 
 [1]
 The villages are Alexander Creek, Anton Larsen Bay, Ayakulik, Bells Flats, Litnik, Port William, Salamatof, Solomon, Uganik, and Uyak. The Secretary has dismissed his appeal from the judgment as it applies to the eleventh village, Pauloff Harbor
 
 
 [2]
 Initially the Board was merely an ad hoc Board. Later the present title was created
 
 
 [3]
 The appellee villages have challenged the District Court's decision that the Forest Service and the Fish and Wildlife Service have standing with respect to the six villages. The Secretary argues that the challenge is barred because the villages have not cross-appealed. Having prevailed below, however, the villages obviously could not have cross-appealed on this issue. Insofar as this attack on the ruling supports their judgment below, however, they may urge the argument here. United States v. American Ry. Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); See Dandridge v. Williams, 397 U.S. 471, 475-76 n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)
 
 
 [4]
 A political subdivision, the Borough of Matanuska-Susitna also challenged the eligibility of Alexander Creek. Because it appears that the interests of the State and its subdivision are substantially identical, we will deal only with the State's positions here
 
 
 [5]
 In the Statehood Act, Alaska disclaimed all rights to lands held by Natives or by the United States in trust for Natives. 72 Stat. 339 (1958). Through ANCSA Congress has elected to extinguish all aboriginal titles and, in exchange therefor, to patent lands to regional corporations in which all Natives participate and to certain villages in which some Natives live. The disclaimer in the Statehood Act clearly bars Alaska from challenging ANCSA itself. But we think it does not bar Alaska from attempting to show that a given village does not meet the threshold requirements of ANCSA any more than it bars Alaska from challenging the title of an Englishman who merely alleges that he is a Native Alaskan
 Indeed, it appears that the Secretary did not even see the proposed findings of fact submitted by the villages to the administrative law judges.
 
 
 [6]
 Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); Morgan v. United States, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129 (1938); United States v. Morgan, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)
 
 
 [7]
 Evidently the submissions of the villages which were received were not even forwarded to the Secretary with the record. See 405 F.Supp. at 1370 n.5
 
 
 [8]
 The ALJ recommended decisions themselves are not attacked here and are accordingly not disturbed
 
 
 [9]
 We of course intimate no view as to the validity of the Congressman's criticism
 
 
 [10]
 The District Court also ruled that the Secretary had not violated his trust responsibilities to the Alaska Natives and that the statutory criteria in the Act for "listed" villages are exclusive. 405 F.Supp. at 1373-74. No appeal has been taken on either issue and we leave the District Court ruling undisturbed
 
 
 [1]
 See text and notes at nn. 5-7 Infra
 
 
 [2]
 See Glidden Co. v. Zdanok, 370 U.S. 530, 552, 82 S.Ct. 1459, 1474, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J., joined by Brennan and Stewart, JJ.) ("(W)hether a tribunal is to be recognized as one created under Article III depends basically upon whether its establishing legislation complies with the limitations of that article; whether, in other words, its business is the federal business there specified and its judges and judgments are allowed the independence there expressly or impliedly made requisite."); Gardner v. FCC, 174 U.S.App.D.C. 234, 238, 530 F.2d 1086, 1090 n.18 (1976) ("(A)djudicative agencies are really a type of 'legislative court,' which operates free from the restrictions of Article III.")
 
 
 [3]
 Cf. Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (Article I tribunal need not comply with the tenure and salary provisions of Article III.)
 
 
 [4]
 National Cable Television Ass'n v. United States, 415 U.S. 336, 342, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974)
 
 
 [5]
 Martin-Trigona v. Federal Reserve Bd., 166 U.S.App.D.C. 30, 33, 509 F.2d 363, 366 (1975) (Bazelon, C. J.); See also American Civil Liberties Union v. FCC, 523 F.2d 1344, 1347 (9th Cir. 1975); National Welfare Rights Org. v. Finch, 139 U.S.App.D.C. 46, 53-54, 429 F.2d 725, 732-33 (1970); Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 334, 359 F.2d 994, 1000 n.8 (1966) and cases cited. For cases recognizing a distinction between judicial and administrative standing See, e. g., Pittsburgh & W.Vir. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930); Alexander Sprunt & Son, Inc. v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832 (1930); Gardner v. FCC, 174 U.S.App.D.C. 234, 238, 530 F.2d 1086, 1090 (1976); Chemehuevi Tribe of Indians v. FPC, 160 U.S.App.D.C. 83, 88, 489 F.2d 1207, 1212 n.12 (1973); United States v. Board of Sch. Com'rs. of Indianapolis, Ind., 466 F.2d 573, 577 (7th Cir. 1972); National Motor Freight Traffic Ass'n v. United States, 205 F.Supp. 529, 593-94 (D.D.C.), Aff'd, 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed.2d 273 (1962), Reh. denied and opinion clarified, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). Commentators have generally recognized that there are practical and theoretical differences between administrative and judicial standing. See 3 K. Davis, Administrative Law Treatise 239-43 (1958); L. Jaffe, Judicial Control of Administrative Action, 524 (1965); Shapiro, Some Thoughts on Intervention Before Courts, Agencies and Arbitrators, 81 Harv.L.Rev. 721, 726, 767 (1968)
 
 
 [6]
 As we stated in Gardner v. FCC, 174 U.S.App.D.C. 234, 238, 530 F.2d 1086, 1090 (1976):
 Within their legislative mandates, agencies are free to hear actions brought by parties who might be without party standing if the same issues happened to be before a federal court. The agencies' responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the constitution or the common law.
 See also Martin-Trigona v. Federal Reserve Bd., 166 U.S.App.D.C. 30, 33, 509 F.2d 363, 366 n.10 (1975); National Welfare Rights Org. v. Finch, 139 U.S.App.D.C. 46, 53, 429 F.2d 725, 732 (1970).
 
 
 [7]
 See also American Communications Association v. United States, 298 F.2d 648, 650-51 (2d Cir. 1962). Martin-Trigona v. Federal Reserve Bd., 166 U.S.App.D.C. 30, 509 F.2d 363 (1975) is exceptional, in that we there sustained a denial of a petitioner's request for a hearing, relying in part on judicial standing concepts. The decision was a limited one, however, and we made it clear that "the different policies applicable to standing before this Court and before an administrative agency might in a different context require different concepts of standing." Id. 166 U.S.App.D.C. at 33, 509 F.2d at 366 n.10. The denial of administrative standing would have been proper in any event under a functional analysis, See Part II Infra, since the petitioner refused to state the nature of his interest. Id. 166 U.S.App.D.C. at 34, 509 F.2d at 367
 
 
 [8]
 See 40 Fed.Reg. 33172 Et seq. (1975), Codified as 43 C.F.R. § 4.900 Et seq. (1976)
 
 
 [9]
 Generally, an appeals court must apply the law including regulations in effect at the time it renders its decision, "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Bradley v. School Bd. of the City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 281-82, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Since the court concludes that the federal agencies and the State of Alaska had administrative standing under 43 C.F.R. § 4.700, maj. op. at 10, 13, it is unnecessary to consider whether 43 C.F.R. § 4.902 should be applied retrospectively to this case. See Nixon v. Sampson, Nos. 75-2194 & 2195 (D.C.Cir., March 22, 1978)
 
 
 [10]
 § 4.700 Who may appeal
 Any party aggrieved by an adjudicatory action or decision of a Department official relating to rights or privileges based upon law in any case or proceeding in which Departmental regulations allow a right of appeal to the head of the Department from such action or decision, should direct his appeal to the Director, Office of Hearings and Appeals, if the case is not one which lies within the appellate review jurisdiction of an established Appeals Board and is not excepted from the review authority delegated to the Director. No appeal will lie when the action of the Departmental official was based solely upon administrative or discretionary authority of such official.
 
 
 [43]
 C.F.R. § 4.700 (1976)
 
 
 [11]
 See Crampton, The Why, Where and How of Broadened Public Participation in the Administrative Process, 60 Geo.L.J. 525 (1972); Gellhorn, Public Participation in Administrative Proceedings, 81 Yale L.J. 359 (1972); Jacks, The Public and Peaceful Atom: Participation in AEC Regulatory Proceedings, 52 Tex.L.Rev. 466 (1974); Shapiro, Supra note 5; cf. Scott, Standing in the Supreme Court A Functional Analysis, 86 Harv.L.Rev. 645 (1973)
 
 
 [12]
 See also Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 22-24, 420 F.2d 577, 590-92 (1969)
 
 
 [13]
 One important distinction might be between a would-be participant seeking to institute a new administrative hearing or appeal, and one merely seeking to intervene in an on-going proceeding. An award of standing in the former circumstances is clearly more burdensome than in the latter. See 3 K. Davis, Administrative Law Treatise 241 (1958). Since intervention generally has no effect on what decisions are reached, or when they are rendered, it might be appropriate in considering requests for intervention merely to focus on (1) whether the potential intervenor represents a point of view that would assist in illuminating the issues; (2) whether he is qualified to represent this point of view; (3) whether other parties to the proceeding could be expected to represent this perspective; and (4) whether there are special considerations that indicate intervention would not be in the public interest
 
 
 [14]
 The Board's functional-type analysis is also found, virtually verbatim, in U.S. Fish & Wildlife Service v. Village of Bells Flats, Final Decision of Board and Secretary (Sept. 20, 1974) at 2-3; and U.S. Forest Service v. Anton Larsen, Inc., Final Decision of Board and Secretary (Oct. 3, 1974) at 2-3. It is alluded to in State of Alaska v. Alexander Creek, Inc., Final Decision of Board and Secretary (Oct. 23, 1974) at 8. The full statement of the analysis in Village of Solomon is as follows:
 It is recognized, as argued by the Respondents, that courts have applied (judicial) tests to determine the standing of litigants before them. However, it must also be remembered that the Board is an administrative body, not a court.
 The Board acts in this proceeding for the Secretary, who has been directed by Congress in Section 11(b)(3) of the Act to determine village eligibility through consideration of census data or other evidence, and to "make findings of fact in each instance."
 In carrying out this duty, delegated to it by the Secretary, the Board is authorized, in its discretion, to direct hearings. (43 CFR 2651.2(a)(5); 43 CFR 4.704).
 It is clearly the purpose of such hearings to enable the Secretary, through the Board, to fulfill his statutory obligation of deciding village eligibility appeals with the fullest possible command of the relevant facts.
 This purpose is best served by recognizing standing of a party who demonstrates a nexus with the village sufficient to assure the presentation of factual evidence relevant to the village's eligibility.
 The Board will therefore be guided by a relatively broad concept of standing, particularly when the Secretary's fact-finding obligation would be thwarted by a more restrictive approach.